**UNITED STATES of America, Plaintiff–Appellee/Cross–Appellant,**

v.

**Hiram Stanley SASSER, II, Defendant–Appellant/Cross–Appellee.**

Nos. 91–6066, 91–6111.

United States Court of Appeals, Tenth Circuit.

July 13, 1992.

Gary Peterson, Oklahoma City, Okl., for defendant-appellant/cross-appellee.

Richard A. Friedman, Atty., Appellate Section, Criminal Div., Dept. of Justice, Washington, D.C. (Karen A. Morrissette, Deputy Chief, Fraud Section, Criminal Div., Dept. of Justice, Washington, D.C., and Timothy D. Leonard U.S. Atty., Western Dist. of Oklahoma, Oklahoma City, Okl., with him on the brief), for plaintiff-appellee/cross-appellant.

Before LOGAN, SEYMOUR and MOORE, Circuit Judges.

LOGAN, Circuit Judge.

Defendant Hiram Stanley Sasser, II appeals his convictions by a jury of one count of conspiracy, in violation of 18 U.S.C. § 371, and eighteen counts of making false statements to the Department of Housing and Human Development (HUD) to obtain Federal Housing Administration (FHA) in-

sured loans and aiding and abetting, in violation of 18 U.S.C. §§ 1010 and 2. The government cross-appeals the dismissal of count 20 of the indictment, which the district court held was barred by the statute of limitations. On appeal defendant challenges his convictions on several grounds: (1) insufficiency of the evidence on the eighteen false statement counts; (2) unlawful multiplicity of the eighteen false statement counts; (3) insufficiency of the evidence on the conspiracy count; and district court error in (4) refusing to give a specific unanimity instruction, (5) refusing to give a requested limiting instruction on the use of other crimes evidence, and (6) refusing to order disclosure of presentence reports under the Jencks Act.

## I

### Facts

Defendant was a loan officer for the Talman Home Mortgage Corporation branch office in Oklahoma City, Oklahoma. In this position defendant attempted to find people to apply for loans through Talman, with respect to which he would receive commissions. The government alleged that defendant conspired with other individuals to fraudulently obtain investor mortgage loans insured by HUD, and to knowingly submit false documents to HUD in order to obtain those loans.

Bryn Gary, a codefendant in this case, was a real estate investor and general partner in Midwest City Homes II, Ltd., and Midwest City Duplexes III, Ltd. In 1983, Gary asked James Reilly, a realtor, to arrange for refinancing loans on some of the Midwest City properties. Reilly approached defendant to help obtain refinancing. Gary and his partnerships could not legally obtain FHA-insured mortgages because they owned more than seven properties in a contiguous subdivision. The defendants organized a scheme that involved arranging for "strawbuyers" to "purchase" properties from Gary and his partnerships without making the investment of their own funds required for obtaining FHA insurance. The strawbuyers then transferred the properties back to Gary and his partnerships.

In applying for the FHA insurance on mortgage loans, the lender and borrowers submitted documents to HUD indicating that the borrowers had adequate financial resources to make the mortgage payments. Upon the closing of the "sale," the lender submitted to HUD a settlement statement that stated the amount of earnest money deposits purportedly paid at the time the contracts of sale were executed. The settlement statements also stated the amounts of fees and charges the buyers purportedly paid at closing. In fact, the buyers did not pay any of the earnest money deposits or fees and charges reflected on the settlement statements. The evidence indicated that defendant knew that the buyers would not be making any investment in the property and would not pay any of the closing costs. The fictitious earnest money payments written into the settlement statements led HUD to believe that the buyers had made the necessary investment in the property.

Another document submitted to HUD after closing was a certificate of commitment, which included certifications by the buyers that all charges and fees collected from the buyers as shown on the settlement statement were paid by the buyers from their own funds. HUD relied on the accuracy of the information in this certificate, also, in issuing FHA mortgage insurance on the loans.

## II

### Jurisdiction Over Government Cross–Appeal

█ We first address whether we have jurisdiction to review the government's cross-appeal of the district court's dismissal of count 20. The district court dismissed count 20 on February 7, 1991, and entered its order on that day. On February 11, the court entered the judgment of conviction on counts 1–19, and that same day defendant filed his notice of appeal. On March 13, 1991, within thirty days of defendant's notice but not of the dismissal order on count 20, the government filed notice of its

cross-appeal. Defendant asserts that the cross-appeal was not timely, and therefore we do not have jurisdiction to hear the cross-appeal. The government contends that under Fed.R.App.P. 4(b) its notice of appeal was timely because it was filed within thirty days after defendant's notice of appeal. Rule 4(b) provides in part: "When an appeal by the government is authorized by statute, the notice of appeal shall be filed in the district court within 30 days after the entry of (i) the judgment or order appealed from or (ii) a notice of appeal by any defendant."

■ The federal government may appeal an adverse judgment in a criminal case only if authorized by federal law. *DiBella v. United States*, 369 U.S. 121, 130, 82 S.Ct. 654, 659, 7 L.Ed.2d 614 (1962) (federal government has no inherent right of appeal in criminal case, and grant of general appellate jurisdiction does not authorize such an appeal); *United States v. Sanges*, 144 U.S. 310, 12 S.Ct. 609, 36 L.Ed. 445 (1892); *see also Arizona v. Manypenny*, 451 U.S. 232, 246–49, 101 S.Ct. 1657, 1666–68, 68 L.Ed.2d 58 (1981) (*Sanges* forecloses criminal appeal in federal court by federal, but not state, government unless express federal statute confers such right to appeal). For appeal authorization in the instant case the government relied upon 18 U.S.C. § 3731, which provides in pertinent part that "[i]n a criminal case an appeal by the United States shall lie to a court of appeals from a decision, judgment, or order of a district court dismissing an indictment or information." The statute also provides that "[t]he appeal in all such cases shall be taken within thirty days after the decision, judgment or order has been rendered and shall be diligently prosecuted." *Id.*

Defendant argues that the government did not meet the time requirement of § 3731, and that no Federal Rule of Appellate Procedure, including Rule 4(b), can extend the jurisdiction for appeal under § 3731. In *United States v. Martinez*, 681 F.2d 1248, 1254 (10th Cir.1982), we concluded that the time limit in § 3731 is jurisdictional and dismissed the government's late appeal. The government points out, however, that at the time *Martinez* was decided, both § 3731 and Rule 4(b) contained the same thirty-day filing requirement, and that Rule 4(b) was amended in 1988 to its present form, permitting government appeals to be filed within thirty days after a defendant has filed a notice of appeal. It argues that the later amendment of Rule 4(b) controls over the statutory language of § 3731.

It is true that in some respects the federal rules have the effect of statutes; 28 U.S.C. § 2072(b) states that although the federal rules shall not affect "any substantive right," "[a]ll laws in conflict with such rules shall be of no further force or effect after such rules have taken effect." The next subsection also permits the federal rules to define when a ruling is "final for the purposes of appeal under section 1291." *Id.* § 2072(c).

■ Thus, absent any further edification we would have to determine whether the thirty-day limitation period of § 3731 is substance or procedure. This seems resolved, however, by a disclaimer in the Federal Rules of Appellate Procedure itself, which states broadly, "These rules shall not be construed to extend or limit the *jurisdiction* of the courts of appeals as established by law." Fed.R.App.P. 1(b) (emphasis added). We regard this as an acknowledgement by the rulemakers that in case of a conflict between a jurisdictional statute and the Rules of Appellate Procedure, the statute controls.

The government cites two other circuit decisions that appear to allow Rule 4(b) to modify the thirty-day requirement of § 3731. Both indicate that a district court can allow the government an extension of time for appeal under Rule 4(b) upon a showing of excusable neglect. *United States v. Vastola*, 899 F.2d 211 (3d Cir.), *cert. granted and vacated on other grounds*, —— U.S. ——, 110 S.Ct. 3233, 111 L.Ed.2d 744 (1990); *United States v. Rothseiden*, 680 F.2d 96, 98 (11th Cir.1982). *Rothseiden* is distinguishable on its facts.[1]

1. *Rothseiden* is distinguishable from the instant case because there the government filed a mo-

Neither case discusses the conflict between rule and statute, but simply assumes that Rule 4(b) applies to government appeals.[2]

The government also argues there is no conflict between § 3731 and Rule 4(b). It points out that the thirty-day requirement in § 3731 is in the same sentence as the requirement that the appeal be diligently prosecuted. This, the government contends, supports the view that Rule 4(b)'s phrase "[w]hen an appeal by the government is authorized by statute" refers to the *type* of appeal (e.g., from an order dismissing an indictment, as in the instant case), but not to any statutory time limit to appeal. The government proposes that we deem that "noncompliance with the 30–day filing requirement of Section 3731 (as potentially extended by the provision of Rule 4(b)) causes the authority to appeal to lapse." Response of the United States to Defendant's Motion to Dismiss at 5. This seems to us a strained argument.

The government's attempt to find a way to take advantage of the thirty-day extension of Rule 4(b) appears at first blush to be meritorious. What prompted the 1988 "extension" amendment to Rule 4(b) were concerns that "the respective time limits on filing appeals currently set forth in Rule 4(b) might place a defendant at a disadvantage in some cases brought under" 18 U.S.C. § 3742, a statute that provides both defendants and the government the right to appeal from the sentence imposed by the court but which does not contain a specific time frame.[3] 134 Cong.Rec. S7456 (daily ed. June 8, 1988). If it is proper to allow a

defendant considering a cross-appeal to take into account whether the government is appealing, should not the government have the same option? To this, we think there are at least two answers.

First, many, if not most, government appeals under § 3731 will be interlocutory, to challenge dismissals or other pretrial rulings. The trial will often be postponed while such appeals are considered in the interests of saving attorney and court time. Congress evidently thought there was social utility in making the government decide within thirty days of rulings against it whether to appeal the ruling or to get on with the trial, when it specified the time limitation in the statute to run from the particular "decision, judgment, or order" "dismissing an indictment," "suppressing or excluding evidence," "granting release," or other motion. 18 U.S.C. § 3731.

Second, the government generally is not as disadvantaged as the defendant by the time limitation. The defendant has only ten days within which to file a notice of appeal. Thus, as the legislative history to the 1988 amendments to Rule 4(b) noted, *see supra* n. 3, a defendant who received a light sentence might let the ten-day appeal filing period elapse and then find that the government later filed an appeal within thirty days given to the government. Defendants needed the extension given by Rule 4(b) to reconsider. But the longer thirty-day time allowed to the government, permitting it to consider appealing *any* order adverse to it made within the preceding

tion to reconsider the dismissals it ultimately tried to appeal within the 30–day period of § 3731, *see* 680 F.2d at 97, and the Supreme Court has held that a motion to set aside an order of dismissal, like a petition for rehearing, renders the original judgment nonfinal for purposes of appeal, *see United States v. Dieter,* 429 U.S. 6, 7–8, 97 S.Ct. 18, 19, 50 L.Ed.2d 8 (1976).

**2.** Other than *Rothseiden* the only cases relied upon by the *Vastola* court were appeals by a defendant, whose appeals are not authorized by § 3731. *See* 899 F.2d at 221 (citing *United States v. Kaden,* 819 F.2d 813, 817 (7th Cir.1987) and *United States v. Golding,* 739 F.2d 183, 184 (5th Cir.1984)). Also, the *Vastola* court did not address the statutory authority for the government appeal, except to state in a footnote that

"[t]he parties agree that … apart from the dispute regarding the timeliness of the government's notice of appeal, we have jurisdiction over the government's appeal under 18 U.S.C. § 3731 and 28 U.S.C. § 1291." 899 F.2d at 220 n. 9.

**3.** The section-by-section analysis of the bill amending Rule 4(b) gives this example:

For instance, where a defendant receives a light sentence, he may allow the 10 day period to lapse without filing an appeal, only to find the government has chosen to file its own appeal within its thirty day limit. In such a case the defendant, under current law, would be foreclosed from filing a cross appeal. 134 Cong.Rec. S7456 (daily ed. June 8, 1988).

thirty days, almost always gives it time, after a defendant has appealed, to consider appealing an order made during or after the trial.

Regardless of how persuasive we might find the government's arguments to be, as a panel we are bound by this court's prior opinion in *Martinez* to dismiss the government's appeal as untimely. Because of our analysis above we are not inclined to ask the en banc court to overrule *Martinez*. Thus, for the reasons stated, we hold that we have no jurisdiction to hear the government's cross-appeal.

## III

### *Sufficiency of the Evidence*

A. False Statement Counts

Defendant argues that there was insufficient evidence to sustain a conviction on any of the false statement charges. " 'Evidence is considered sufficient to support a criminal conviction if, when viewed in the light most favorable to the government, a reasonable jury could find the defendant guilty beyond a reasonable doubt.' " *United States v. Ratchford*, 942 F.2d 702, 703 (10th Cir.1991) (quoting *United States v. Culpepper*, 834 F.2d 879, 881 (10th Cir. 1987)), *cert. denied,* —— U.S. ——, 112 S.Ct. 1185, 117 L.Ed.2d 427 (1992); *see also Burks v. United States,* 437 U.S. 1, 17, 98 S.Ct. 2141, 2150, 57 L.Ed.2d 1 (1978); *United States v. Hooks,* 780 F.2d 1526, 1531 (10th Cir.), *cert. denied,* 475 U.S. 1128, 106 S.Ct. 1657, 90 L.Ed.2d 199 (1986).

By charging separate crimes as to each document, the government treated the settlement statement and certificate of commitment, both of which were submitted in support of a single loan, as separate, not integrated documents. In separate counts, the indictment charged defendant with making false statements in the certificates of commitment and again in the settlement statements. Because of the way the government charged and handled the case at trial, we analyze the evidence on the basis of the government's terms, considering each document as standing on its own. Our conclusion that the evidence supports the convictions on the settlement statement counts, but not on the certificate of commitment counts, eliminates our need to reach and discuss the issue of multiplicity.

Defendant concedes that the certificates of commitment and settlement statements contain false information, but contends that there is no evidence he made or caused to be made any of the false statements actually charged in counts 2–19. The specific language of the indictment alleges that defendant "represented and caused to be represented in HUD Settlement Statements and Certificates of Commitment ... that the buyers made the specified down payments and earnest money deposits, when in truth and in fact, as defendants well knew, these payments were not made by the buyers." I R. 12. Furthermore, the jury was instructed only as to false statements regarding down payment and earnest money deposits; the jury instructions say nothing regarding fees and charges.

### 1. *The Commitment Certificate Counts*

Defendant asserts that the language of the commitment certificates, that "[a]ll charges and fees collected from me as shown in the settlement statement have been paid from my own funds," Appellant's Brief tab K, does not encompass earnest money deposits or down payments. We agree.

Although the settlement statements identify a number of items as "charges" or "fees," neither earnest money nor down payment is designated as a "charge" or "fee" on the settlement statements. The purpose of the "charges" and "fees" certification is to assure that the lender did not impose excessive or unauthorized fees. *See, e.g.,* 24 C.F.R. § 203.27 (down payment and earnest money not mentioned in list of authorized "charges, fees or discounts."). The certification is not directed to earnest money or down payment; in fact the certificates of commitment make no statements about earnest money or down payment. A defendant may not be convicted for a statement not charged in the indictment. *See*

*Eaton v. Tulsa,* 415 U.S. 697, 699, 94 S.Ct. 1228, 1230, 39 L.Ed.2d 693 (1974).

We also reject the government's argument that we can uphold the convictions for false statements in the certificates of commitment based on the mortgagee's certification. The mortgagee certifies that "[t]he statements made in its application for insurance and in the Mortgagor's Certificate are true and correct to our best knowledge." Appellant's Brief tab K. As to the mortgagor's certificate, we have ruled above that this does not make the charged false statements concerning earnest money and down payment. As to the application for insurance, the record on appeal includes only one of the applications for commitment for insurance, related to count 3. *See* II R. tab 148, gov't ex. 6. Even assuming they all are the same, and that the government can rely on the mortgagee's certificate—which it apparently did not at trial—we cannot uphold the convictions. The application for commitment for insurance includes, at item 24K, an entry for the "cash from borrower," which we interpret to mean down payment; but it makes no representation concerning earnest money. As we note in our discussion of the unanimity issue, *infra* Part IVA, the indictment and jury charge required the jury to find that defendant made a false statement involving both earnest money and down payment. Therefore, we hold there was insufficient evidence on which to base the nine convictions for making a false statement on the commitment certificates in violation of 18 U.S.C. § 1010.

### 2. *The Settlement Statement Counts*

■ Defendant also asserts that the settlement statements do not make the charged false statements concerning earnest money and down payment. The Supreme Court has defined the term "false statement" in a statute containing language similar to 18 U.S.C. § 1010 as a false "factual assertion." *See Williams v. United States,* 458 U.S. 279, 284, 102 S.Ct. 3088, 3091, 73 L.Ed.2d 767 (1982) (interpreting 18 U.S.C. § 1014). Defendant argues that the settlement statement does not state the down payment at all. The government, however, correctly points out that the amount of down payment or equity can be figured from other information on the settlement statement.[4]

Defendant next argues that the indictment charged as the false statement that the *buyers* made the specified down payments and earnest money deposits. Defendant notes that the settlement statement does not expressly state that the buyers are making the payments from their own funds. A false statement, however, can be implied by "use of a document [that] makes the factual assertions necessarily implied from the statutes, regulations, and announced policies that created the document." *United States v. Waechter,* 771 F.2d 974, 979 (6th Cir.1985) (overturning conviction of defendant, finding alleged implied false statement not proven). It is clear that HUD policies in effect at the time required that the buyers pay the earnest money and down payment from their own funds and defendant knew of those policies. Therefore, the government contends that defendant's use of the settlement statement made the implied false statement that the buyers' equity had been paid from the buyers' own funds.

Although implying false statements to find a violation of § 1010 can be carried too far, given the facts of this case it is clear that defendant made or caused to be made false entries on the settlement statement. The entries made false statements that the buyers paid earnest money and down payments that in fact defendant knew were never paid by buyers. The government presented sufficient evidence on which the jury could find defendant guilty beyond a reasonable doubt of the nine counts of making a false statement on the settlement statements in violation of 18 U.S.C. § 1010.

---

4. Down payment can be determined by calculations based on several items on the settlement form: subtracting the new loan amount from the purchase price, and adding charges to the buyer.

**B. Conspiracy Count**

▇▇▇ Defendant also asserts that there was insufficient evidence to support his conspiracy conviction. Conspiracy consists of an agreement to violate the law, knowledge by the defendant of the essential objectives of the conspiracy, and knowing and voluntary participation by the defendant in the conspiracy. *See United States v. Fox,* 902 F.2d 1508, 1514 (10th Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 199, 112 L.Ed.2d 161 (1990). Defendant argues that the jury could have based its guilty verdict on a conspiracy to commit the § 1010 violations charged in counts 2–19, for which he argues there was insufficient evidence. Because we uphold nine of the eighteen substantive violations of § 1010, and because we conclude that there was sufficient evidence to prove beyond a reasonable doubt that defendant and others were involved in a common plan involving false statements to HUD, we must uphold the count 1 conspiracy conviction.

**IV**

*Jury Instructions*

Defendant contends that the district court erred in refusing to give two jury instructions requested by defendant. We review a challenge to jury instructions by reviewing "the record as a whole to determine whether the instructions state the law which governs and provided the jury with an ample understanding of the issues and the standards applicable." *United States*

*v. Cardall,* 885 F.2d 656, 673 (10th Cir. 1989) (quotation marks and citation omitted).

**A. Unanimity Instruction**

▇▇▇ Defendant argues he was deprived of his right to a unanimous verdict. *See* Fed.R.Crim.P. 31(a) (unanimous verdict required); *Andres v. United States,* 333 U.S. 740, 748, 68 S.Ct. 880, 884, 92 L.Ed. 1055 (1948) (constitutional unanimity requirement). He contends that each false statement count charged two separate incidents of the same offense because each count referred to both earnest money and down payment.[5] Although defendant requested a specific unanimity jury instruction,[6] the trial court gave only a general unanimity instruction, which defendant argues was reversible error. Because defendant requested the instruction, we review this issue for an abuse of discretion. *See, e.g., United States v. Beros,* 833 F.2d 455, 458 n. 3 (3d Cir.1987).

"In this circuit, as in most others, 'it is assumed that a general instruction on the requirement of unanimity suffices to instruct the jury that they must be unanimous on whatever specifications they find to be the predicate of the guilty verdict.'" *United States v. Phillips,* 869 F.2d 1361, 1366 (10th Cir.1988) (quoting *United States v. McClure,* 734 F.2d 484, 494 (10th Cir. 1984)), *cert. denied,* 490 U.S. 1069, 109 S.Ct. 2074, 104 L.Ed.2d 638 (1989). As we

---

**5.** Defendant thus impliedly asserts that the indictment was duplicitous. *See United States v. Dashney,* 937 F.2d 532, 540 n. 7 (10th Cir.) ("Duplicity refers to the inclusion of various offenses in a single count of an indictment"), *cert. denied,* —— U.S. ——, 112 S.Ct. 402, 116 L.Ed.2d 351 (1991); *Bins v. United States,* 331 F.2d 390, 392–93 (5th Cir.) (holding indictment duplicitous because each count charged defendant made multiple false statements in separate documents), *cert. denied,* 379 U.S. 880, 85 S.Ct. 149, 13 L.Ed.2d 87 (1964).

One vice of duplicity is that a jury may find a defendant guilty on a count without having reached a unanimous verdict on the commission of a particular offense. This may conflict with a defendant's Sixth Amendment rights and may also prejudice a subsequent double jeopardy defense. Duplicity may also give rise to problems regarding the admissibil-

ity of evidence, including its admissibility against one or more codefendants.
*United States v. UCO Oil Co.,* 546 F.2d 833, 835 (9th Cir.1976), *cert. denied,* 430 U.S. 966, 97 S.Ct. 1646, 52 L.Ed.2d 357 (1977).

**6.** The requested instruction provided in pertinent part:

Your verdict must be unanimous as to each count, that is, agreed to by every juror. If a count of the indictment charges that more than one false statement or representation was made, all jurors must agree as to at least one of the alleged false statements or representations before a guilty verdict based on false statement or representation can be returned as to that count.
Appellant's Brief tab J (Requested Instruction No. 20).

noted in *Phillips*, other circuits have made exceptions to this rule.[7]

Defendant urges us to find that the instant case falls outside the general rule that a general unanimity instruction is sufficient because the government charged two distinct acts in each count, both of which could support a violation of § 1010. Each false statement count charged defendant with making the false statement that the buyers paid the specified down payments and earnest money deposits. Defendant points out that earnest money and down payments were different items and were calculated differently. Defendant argues that based on the indictment, some jurors may have found that defendant made a false statement as to earnest money, while others may have found he made a false statement as to down payment, and that the general unanimity instruction was not adequate to ensure a unanimous verdict. We disagree.

The indictment and jury charge were stated in the conjunctive, "that the buyers made the specified down payments *and* earnest money deposits, when in truth and in fact, as defendants well knew, these payments were not made by the buyers." I R. 12 (indictment) (emphasis added); *see also* II R. tab 186 (Instruction No. 5). If the jurors followed the instructions and the requirements of the indictment, as we must assume, to reach a guilty verdict on an individual count each juror had to find that defendant made a false statement involving *both* earnest money and down payment. In the instant case, the falsity of the earnest money deposits and down payments were intimately intertwined; they were not conceptually distinct acts. Thus, there was no real potential for a nonunanimous verdict, and we hold that the district court did

not abuse its discretion in refusing to give a specific unanimity instruction.

**B. Limiting Instruction**

█ Defendant also argues that the district court erred in refusing to give a requested limiting instruction on the effect of certain evidence that he asserts was admitted as "other crimes" evidence under Fed. R.Evid. 404(b). Defendant asserts that two items of evidence were "other crimes" evidence. One item was a letter dated May 30, 1985, that defendant wrote to HUD apparently for the purpose of resolving any questions raised as to the loan applications of strawbuyer Mel Huffaker. The Huffaker applications were part of the conspiracy alleged in count 1, and Huffaker was the strawbuyer in counts 2–5. The letter stated that the money for Huffaker's property purchases came from his savings and his profit sharing plan. Mr. Huffaker testified that this and other statements in the letter were untrue. The other item of evidence was a statement by defendant to a HUD auditor in the presence of Debbie Borron, a loan processor at Talman, that Borron, not defendant, was handling the loans involving strawbuyers. Borron testified that this statement was untrue. This statement was made during HUD's investigation of some of the loans at issue in this case, apparently in 1987, although the charged conspiracy ended in 1985. When these two items were admitted into evidence, defense counsel made no objection and made no request for the basis of admissibility or for a limiting instruction. Later, at the close of the case, defense counsel asked for a limiting instruction on "other acts."

Under Federal Rule of Evidence 105, upon request the trial court shall "instruct the jury that the similar acts evidence [under Rule 404(b)] is to be considered only

---

7. In *United States v. Ryan*, 828 F.2d 1010, 1020 (3d Cir.1987), the Third Circuit listed four types of exceptions to the rule that a general unanimity instruction is usually sufficient: (1) in cases with exceptionally complex facts; (2) if a single count contains marginally related or contradictory allegations; (3) in cases in which there is some variance between the indictment and the proof offered at trial; and (4) in cases with a tangible indication of jury confusion.

Other courts have found that a specific unanimity instruction is required if the jury could have reached a guilty verdict as a result of different jurors deciding that the defendant committed totally distinct acts. *United States v. Hiland*, 909 F.2d 1114, 1140 n. 44 (8th Cir.1990); *United States v. Busacca*, 863 F.2d 433, 437 (6th Cir.1988), *cert. denied*, 490 U.S. 1005, 109 S.Ct. 1640, 104 L.Ed.2d 156 (1989); *Beros*, 833 F.2d at 461.

for the proper purpose for which it was admitted." *Huddleston v. United States,* 485 U.S. 681, 691–92, 108 S.Ct. 1496, 1502, 99 L.Ed.2d 771 (1988). "Rule 404(b) only applies to evidence of acts extrinsic to the charged crime." *United States v. Record,* 873 F.2d 1363, 1372 n. 5 (10th Cir.1989); *see also United States v. Orr,* 864 F.2d 1505, 1510 (10th Cir.1988) (testimony that "related to the [government's] investigation in the case at bar ... constituted direct evidence about the scheme for which [defendant] was being tried," so not extrinsic to charged crime); *United States v. Merida,* 765 F.2d 1205, 1221 (5th Cir.1985) (conduct during the life of a conspiracy that is evidence of the conspiracy is not "other crimes" evidence); *United States v. Lester,* 749 F.2d 1288, 1299 (9th Cir.1984) (if evidence relates to the charged conspiracy and was not admitted under Rule 404(b), no limiting instruction is necessary).

The letter was written during the life of the conspiracy, and at least as to the false statement regarding the source of the buyer's funds, was direct evidence of the charged conspiracy and substantive crimes. As to the other statements in the letter, these were not "extrinsic" to the charged crimes because they were "inextricably intertwined with the evidence of the charged crime." *United States v. Richardson,* 764 F.2d 1514, 1521 (11th Cir.1985). Likewise, the defendant's statement to HUD investigators, although made after the conspiracy had terminated, was evidence of the charged crimes. *See Orr,* 864 F.2d at 1510. Specifically, the statement was evidence of defendant's consciousness of wrongdoing and knowing involvement in the conspiracy. We conclude that the letter and statement to HUD investigators were intrinsic evidence of the charged crimes and not 404(b) evidence. Therefore, the district court did not err in refusing to give the proposed limiting instruction.

## V

### *Jencks Act*

Finally, defendant alleges that the district court erred in refusing to order disclosure of the presentence reports on two key government witnesses, Bryn Gary and James Reilly, under the Jencks Act, 18 U.S.C. § 3500. The statute provides, in pertinent part:

> After a witness called by the United States has testified on direct examination, the court shall, on motion of the defendant, order the United States to produce any statement ... of the witness in the possession of the United States which relates to the subject matter as to which the witness testified.

18 U.S.C. § 3500(b). Defendant points out that official instructions for preparation of presentence reports indicate that the reports must contain a "defendant's version" section. Thus, he asserts that the presentence reports on the two witnesses would have contained a "defendant's version" constituting a "statement" under the Jencks Act; these necessarily would have related to the witnesses' testimony because Gary and Reilly were involved in and convicted for the same scheme for which defendant was charged. Finally, defendant asserts that the statements were in the possession of either "the United States," 18 U.S.C. § 3500(b), or "the attorney for the government," Fed.R.Crim.P. 26.2(a). The trial prosecutors had a copy of Gary's presentence report; they had seen but not kept a copy of Reilly's presentence report, although the Bureau of Prisons held a copy of Reilly's report that would have been available to the prosecutors on request. Thus, defendant argues, the presentence reports met all of the requirements for mandatory disclosure under the Jencks Act, and should have been produced after the witnesses testified on direct examination.

In *United States v. Dingle,* 546 F.2d 1378 (10th Cir.1976), this court held that a presentence report is not discoverable under the Jencks Act. In *Dingle,* we stated that "[w]e concur in the trial court's finding that a presentence report is not a producible 'statement' under the Jencks Act. The need for maintaining the confidentiality of a probation report outweighs any

possible need for its discovery under the Jencks Act." *Id.* at 1380.[8]

Two of the bases for our holding in *Dingle* have been undercut, by a difference in facts between the cases and a subsequent legal development. First, we emphasized in *Dingle* that the presentence report is prepared by and for the court and that it "is not available to the prosecution. It is not submitted to or in the possession of the government." *Id.* at 1381. That is contrary to the government's admission here, that prosecutors at trial had a copy of one witness' report and had seen, and could obtain, a copy of the other. V R. 4–7; VIII R. 412.

Second, in *Dingle* we stated that "[w]e have held that a presentence report does not fall within the Freedom of Information Act, 5 U.S.C.A. § 552, because it is not agency information. It follows that a presentence report should not be made available under the Jencks Act." 546 F.2d at 1381 (citation omitted). In *United States Dep't of Justice v. Julian*, 486 U.S. 1, 108 S.Ct. 1606, 100 L.Ed.2d 1 (1988), the Supreme Court held that under the Freedom of Information Act (FOIA) there is no government privilege preventing disclosure of a presentence report requested by the subject of the report. *Id.* at 14, 108 S.Ct. at 1614.

Most other circuits that have directly addressed whether a defendant is entitled to a witness' presentence report under the Jencks Act have permitted review if it was in the hands of a prosecutor as distinguished from the probation officer, or have ordered production of parts of the report that contain impeaching material after in camera review by the court. *See United States v. Moore*, 949 F.2d 68, 71–72 (2d Cir.1991) (stating that a presentence report was not Jenks Act material but nonetheless making in camera review and finding no exculpatory or impeaching material for which the defendant had a "compelling need"), *cert. denied*, —— U.S. ——, 112

S.Ct. 1678, 118 L.Ed.2d 396 (1992); *United States v. DeVore*, 839 F.2d 1330, 1332–33 (8th Cir.1988) (approving district court's in camera review of requested presentence report and release to the defendant of only the portion of the report containing codefendant's version of the robbery); *United States v. Anderson*, 724 F.2d 596, 598 (7th Cir.1984) (upon request court should make in camera review and reveal to defendant only "portions of the report that contain the impeaching material"); *United States v. Trevino*, 556 F.2d 1265, 1271 (5th Cir. 1977) (no Jencks Act right to report in hands of probation officer, but stating in dicta that "a witness' presentence report held by the prosecution might thus be subject to Jencks Act production"); *United States v. Figurski*, 545 F.2d 389, 392 (4th Cir.1976) (same as *Anderson*); *United States v. Dansker*, 537 F.2d 40, 60–61 (3d Cir.1976) (holding that a witness' presentence report is not producible under either *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), or the Jencks Act even though it contained a statement signed by the witness; court apparently concluded that the report was not "in the possession of the United States" because the prosecution has access only under limited circumstances; but stating that "statements possessed by ... the F.B.I. or a United States Attorney must be turned over to the defense on proper motion"), *cert. denied*, 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977); *cf. United States v. Walker*, 491 F.2d 236, 238 (9th Cir.) (no *Brady* right to examine presentence report, court could rely on probation officer's review for exculpatory material rather than itself make in camera review), *cert. denied*, 416 U.S. 990, 94 S.Ct. 2399, 40 L.Ed.2d 769 (1974).

As with the Fed.R.App.P. 4(b)–§ 3731 issue, we considered whether to ask en banc reconsideration of *Dingle*. But because the presentence reports are in the appellate record, and the district court apparently reviewed both witnesses' presentence re-

---

**8.** In *Dingle*, we did not require an in camera review by the district court to determine if the presentence reports should be produced, because an in camera review is not required "un-

less the requested document possibly satisfies the requirements of the Jencks Act." 546 F.2d at 1381.

ports—it made a specific finding that one was not helpful to defendant, *see* VI R. 382—we first determine whether the Jencks Act error, if there was one, was harmless.

The Supreme Court has said that "[s]ince courts cannot 'speculate whether [Jencks material] could have been utilized effectively' at trial, the harmless-error doctrine must be strictly applied in Jencks Act cases." *Goldberg v. United States*, 425 U.S. 94, 111 n. 21, 96 S.Ct. 1338, 1348 n. 21, 47 L.Ed.2d 603 (citation omitted); *accord, e.g., United States v. Bibbero*, 749 F.2d 581, 585 (9th Cir.1984), *cert. denied*, 471 U.S. 1103, 105 S.Ct. 2330, 85 L.Ed.2d 847 (1985); *United States v. Peters*, 625 F.2d 366, 371 (10th Cir.1980); *see also United States v. Snow*, 537 F.2d 1166, 1168 (4th Cir.1976) (stating that Jencks Act violation is excused only when no prejudice is "perfectly clear").

Based on our review of the two presentence reports, we conclude that the failure to disclose them, if it was error, was harmless. Nothing in either report is dramatically or even substantially inconsistent with the evidence at trial. Gary's fifteen-paragraph version, if anything, emphasizes defendant's culpability. Reilly's letter contains more specific facts regarding the transactions, and while there may be slight inconsistencies between the letter and his trial testimony, there is nothing that would have exonerated defendant or cast doubt on his guilt. Thus, even under a very strict application of the harmless error standard, we conclude that the failure to produce was harmless.

AFFIRMED IN PART, REVERSED IN PART, and REMANDED. On remand the district court is instructed to vacate the nine false statement convictions relating to the certificates of commitment (counts 3, 5, 7, 9, 11, 13, 15, 17 and 19) and to resentence consistent with this opinion. We DISMISS the government's cross-appeal.