UNITED STATES of America, Plaintiff,

v.

Mark M. JACKSON, and Robert
Martinez, Jr., Defendants.

No. 94–40001–01/02–SAC.

United States District Court,
D. Kansas.

May 6, 1994.

Tanya J. Treadway, Office of U.S. Atty., Kansas City, KS, Richard L. Hathaway, Office of U.S. Atty., Topeka, KS, for U.S.

Thomas J. Bath, Jr., James L. Eisenbrandt, Bryan Cave, Overland Park, KS, for Mark M. Jackson.

Thomas M. Bradshaw, Daniel O. Herrington, Armstrong, Teasdale, Schlafly & Davis, Kansas City, MO, for Robert Martinez, Jr.

## MEMORANDUM AND ORDER

CROW, District Judge.

The case comes before the court on three matters. First, the government on April 18, 1994, submitted certain materials for the court's in camera inspection. (Dk. 57). The court unsealed the documents in the government counsel's presence and heard their arguments on April 25, 1994. Second, the defendants filed on April 13, 1994, a joint motion for issuance of subpoenas pursuant to Rule 17(c) of the Federal Rules of Criminal Procedure. (Dk. 55). Third, the defendants filed on April 25, 1994, a joint motion for production of portions of Louis Garcia's presentence report. (Dk. 62). The court heard oral argument on the defendants' joint motions on April 28, 1994.

### Background

The defendants are charged by a thirty-two count indictment for their association and conduct with Parkview Hospital (Parkview), a private, for profit psychiatric hospital in Topeka, Kansas. The defendant Mark Jackson was an administrator at Parkview, and the defendant Robert Martinez was a marketing representative with Parkview. The indictment alleges that the defendants bribed Louis Albert Garcia, an employee assistance counselor with the United States Postal Service, to refer patients to Parkview. Between approximately November of 1990 and January of 1992, the defendants paid Garcia $3,000 monthly and Garcia referred forty-three patients to Parkview.

Count one charges both defendants with conspiring to defraud the United States of the faithful services of its employee Louis Garcia, in violation of 18 U.S.C. § 371. For each monthly payment made to Garcia, both defendants are also charged with two counts. The even-numbered counts from two through thirty charge the defendants with bribery of Garcia in giving something of value in order to influence Garcia's official acts, in violation of 18 U.S.C. § 201(b)(1)(A). The odd-numbered counts from three through thirty-one charge the defendants with aiding and abetting Louis Garcia in the supplementation of his federal salary, in violation of 18 U.S.C. §§ 2 and 209. Count thirty-two charges that the defendants endeavored to obstruct and impede the federal grand jury investigation by advising Garcia to testify falsely that the payments were made as lawful compensation for consulting services, in violation of 18 U.S.C. § 1503.[1]

### I. In Camera Review of Materials

On March 30, 1994, the court entered a memorandum and order deciding the defendants' pending pretrial motions. (Dk. 52). Among the motions decided was the defendants' joint motion for discovery of favorable and impeaching evidence. (Dk. 30). The court granted the defendants' motion in part and ordered production of certain documents within the prosecution's possession. On the defendants' request for Louis Garcia's personnel file at the United States Postal Service, the court ordered:

> As for Garcia's entire personnel file, the court directs the prosecutor to review it and produce all material impeachment and exculpatory evidence from it. If the prosecution is uncertain about the materiality of some information in the personnel file or is confronted with difficult privacy issues, then it should submit the information to the court for an in camera inspection and evaluation.

(Dk. 52 at 42). The court similarly required the prosecution to review for material impeachment evidence the files relating to the Postal Service's internal investigation of Louis Garcia. (Dk. 52 at 45). On April 18, 1994, the prosecution submitted for the court's in camera inspection five groups of documents either taken from Garcia's personnel file or the Postal Service's internal investigation files.

 The court agrees with the prosecution that the first two groups of documents concern events too remote in time to constitute material impeachment evidence. Attached to the defendants' reply brief (Dk. 64) filed on April 26, 1994, were most of the documents constituting the third category. The defendants represented in their brief that the prosecution provided these documents to them on April 18, 1994. Having already produced all or most of these documents, the prosecution has waived its objection. The court orders full disclosure of the third group of documents. The court does not compel disclosure of the fourth group for the reasons argued by the prosecution. As to the fifth group, the court orders the prosecution to disclose those documents beginning at page ten through the last page. The tenth page is the "Notice of Proposed Indefinite Suspension" from the United States Post Office to Louis Garcia dated October 12, 1993. The last page is the PS Form 2574, Resignation From Postal Service, apparently signed by Louis Garcia on November 13, 1993. As for all other documents in the fifth group, the court agrees with the government's reasons for non-disclosure.

### II. Rule 17(c) Motion

After the court's March 30th order, the defendants filed a joint motion for issuance of subpoenas pursuant to Rule 17(c) of the Federal Rules of Criminal Procedure. (Dk. 55). The defendants seek information that breaks down into four different categories: (1) psychiatric and mental health records of Louis Garcia; (2) documentary evidence of other consulting agreements between Louis Garcia and Bowling Green Hospital, La Hacienda Hospital and Psychiatric Institute of Texas; (3) documentary evidence from Louis Garcia concerning his relationship and activities

---

**1.** A superseding indictment filed May 4, 1994, modifies count thirty-two to charge the defendants of conspiring with each other and with Garcia to obstruct and impede a grand jury investigation in violation of 18 U.S.C. §§ 371, 1503.

with Parkview and other hospitals and his tax returns for 1988 and 1992; (4) documentary evidence from Louis Garcia's attorney, Gene Garcia, concerning correspondence, proffers and agreements between Louis Garcia and the federal government. The defendants seek this information from seven different sources.

## A. Governing Law

■ Rule 17(c) provides in pertinent part: The court may direct that books, papers, documents or objects designated in the subpoena be produced before the court at a time prior to the trial or prior to the time when they are to be offered in evidence and may upon their production permit the books, papers, documents or objects or portions thereof to be inspected by the parties and their attorneys.

A subpoena duces tecum under Rule 17(c) "was not intended to provide a means of discovery for criminal cases ... but to expedite the trial by providing a time and place *before* trial for the inspection of subpoenaed materials." *United States v. Nixon,* 418 U.S. 683, 698–99, 94 S.Ct. 3090, 3103, 41 L.Ed.2d 1039 (1974). In other words, Rule 17(c) is not a discovery tool but offers compulsory process for securing specific, identifiable evidence for trial.

■ For an order to issue requiring production before trial, the moving party must demonstrate:

(1) that the documents are evidentiary and relevant;

(2) that they are not otherwise procurable reasonably in advance of trial by exercise of due diligence;

(3) that the party cannot properly prepare for trial without such production and inspection in advance of trial and that the failure to obtain such inspection may tend unreasonably to delay the trial; and

(4) that the application is made in good faith and is not intended as a general "fishing expedition."

*Nixon,* 418 U.S. at 699–700, 94 S.Ct. at 3103; *see also United States v. Gonzalez–Acosta,* 989 F.2d 384, 389 (10th Cir.1993). The Supreme Court in *Nixon* summarized the moving party's burden as clearing the three hurdles of relevancy, admissibility, and specificity. 418 U.S. at 700, 94 S.Ct. at 3103. It is left to the trial court's discretion to judge whether these hurdles have been cleared. *United States v. Eden,* 659 F.2d 1376, 1381 (9th Cir.1981), *cert. denied,* 455 U.S. 949, 102 S.Ct. 1450, 71 L.Ed.2d 663 (1982).

■ It is not enough that the documents have some *potential* of relevance and evidentiary use. *United States v. Burger,* 773 F.Supp. 1419, 1425 (D.Kan.1991). There must be a "sufficient likelihood" that the requested material is "relevant to the offenses charged in the indictment," and a "sufficient preliminary showing that ... [the requested material] contains evidence admissible with respect to the offenses charged." *Nixon,* 418 U.S. at 700, 94 S.Ct. at 3104. Conclusory allegations of relevance and admissibility are insufficient. *Burger,* 773 F.Supp. at 1425; *see United States v. Eden,* 659 F.2d at 1381.

■ Specificity is the hurdle on which many subpoena requests stumble. This requirement ensures that the subpoenas are used only to secure for trial certain documents or sharply defined groups of documents. *United States v. Crosland,* 821 F.Supp. 1123, 1129 (E.D.Va.1993). It also serves to prevent the subpoena from being converted into a license for what the Supreme Court in *Bowman Dairy Co. v. United States,* 341 U.S. 214, 221, 71 S.Ct. 675, 679, 95 L.Ed. 879 (1951), decried as a "fishing expedition to see what may turn up". *Crosland* 821 F.Supp. at 1129; *see United States v. Noriega,* 764 F.Supp. 1480, 1493 (S.D.Fla. 1991) ("If the moving party cannot reasonably specify the information contained or believed to be contained in the documents sought but merely hopes that something useful will turn up, this is a sure sign that the subpoena is being misused"). The specificity requirement provides the subpoenaed party or other party having standing with enough knowledge about what documents are being requested so as to lodge any objections on relevancy or admissibility. *See Black v. Sheraton Corp. of America,* 564 F.2d 531, 545 (D.C.Cir.1977).

■ In describing the documents, the subpoena must refer to specific documents or, at least, to specific kinds of documents. 2 Charles A. Wright, *Federal Practice and Procedure* § 275 at 159 (1982); *see United States v. McCollom,* 651 F.Supp. 1217 (N.D.Ill.), *aff'd,* 815 F.2d 1087 (7th Cir.1987). Requesting entire files instead of specific documents indicates a fishing expedition. *United States v. Reed,* 726 F.2d 570, 577 (9th Cir.), *cert. denied,* 469 U.S. 871, 105 S.Ct. 221, 83 L.Ed.2d 151 (1984). The specificity hurdle, however, cannot be cleared by simply naming the title of the document. *United States v. Arditti,* 955 F.2d 331, 345–46 (5th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 597, 121 L.Ed.2d 534 (1992). The moving party must specify why the materials are wanted, what information is contained in the documents, and why those documents would be relevant and admissible at trial. *See Arditti,* 955 F.2d at 345–46.

■ Conjecture and speculation will not provide the lift to carry a movant over the three hurdles. Without detailed information on the requested documents, the court is only left "to speculate as to the specific nature of their contents and its relevance." *Id.* at 346. In *Nixon,* the movant provided sworn testimony from the participants in the recorded conversations and supplied reasons from which rational inferences could be drawn on the relevance of the tapes. 418 U.S. at 700, 94 S.Ct. at 3103–04. Generally, courts conduct *in camera* reviews of the requested material to decide if the three hurdles are satisfied. *Arditti,* 955 F.2d at 347 (Goldberg, J., concurring). If the movant, however, fails to make a threshold showing of a specific demand for relevant and admissible material, then the court may deny the request without conducting an *in camera* review. *Id.* at 348. The defendants here do not ask for an *in camera* review.

## B. Discussion

■ The government opposes the issuance of the defendants' subpoenas saying they are thinly-veiled attempts at discovery. In the government's opinion, the defendants' showing of relevance or materiality does not rise above conclusory allegations. With the exception of Garcia's tax records, the defendants' requests are not sufficiently specific. The operative language in the subpoenas, according to the government, amounts to sweeping requests for documents that reveal the defendants are on a fishing expedition rather than a good faith quest for specifically identified evidence. The government says its contention is further supported by the fact that the defendants now seek to subpoena some of the same documents on which their earlier discovery requests were denied. Finally, the government argues the defendants are not able to discover any of Garcia's records concerning psychotherapy treatment for alcohol abuse without a proper court order pursuant to federal statue.

The court agrees that the defendant's proposed subpoenas unquestionably resemble discovery requests. The subpoenas employ such terms as "any and all documents" or "including, but not limited to;" these are indicia of a fishing expedition. The subpoenas aim for what appears to be a broad array and large number of documents. The subpoenas, in several instances, seek entire files, all correspondence, and all related records. This is more indicia of a fishing expedition. Such requests fail to delineate the particular documents or kinds of documents sought from these files and records.

More often than not, the defendants fail to demonstrate that they know what information is contained in these documents and that this information would be relevant to their defense. Some of their requests hinge on the supposition that since they know that Garcia gave two prior conflicting statements then there must be more. For the most part, the defendants seek only impeachment evidence on their 17(c) subpoenas. Even assuming impeachment evidence would be found in the requested records, the court doubts that the defendants' preparation of an effective cross-examination depends upon their review of this cumulative evidence in advance of trial. "Generally, the need for evidence to impeach witnesses is insufficient to require its production in advance of trial." *United States v. Nixon* 418 U.S. at 701–02, 94 S.Ct. at 3104 (citation omitted).

In the first category of information, the defendants seek to subpoena "any and all records" in the "care, custody and control" of Dr. Robert L. Jimmenez or the Veterans Center in Corpus Christi "relating to the treatment, care and evaluation of Louis Albert Garcia, ... for the period 1988 to the present." The defendants contend that Garcia's present psychiatric condition and his mental state during the period covered by the indictment impact his credibility and his ability to recall events. The government disputes the admissibility of these matters and refers to Garcia's self-appraisal at the omnibus hearing and change of plea hearing that his medical care did not prevent him from understanding the proceedings and entering a plea. The government characterizes the defendants' subpoena as a subtle attempt at harassing Garcia. In reply, the defendants deny any intent to embarrass or harass Garcia. The defendants further argue:

> Documents produced by the government on April 18, 1994 underscore the seriousness of Garcia's psychiatric condition. On September 7, 1993, Garcia was adjudged by the postal service to be totally disabled as a result of a "major depressive disorder" and "post traumatic stress disorder." *See* p. 2 of Exhibit L attached hereto and incorporated herein, which is an internal postal service document. Page 1 of Exhibit L reflects that Garcia has been placed on sick leave. Clearly, defendants are entitled to the requested documents not only to attack Garcia's credibility, but also to enable them to explore the impact of Garcia's psychiatric condition on his ability to recollect events accurately.

(Dk. 64 at 2–3). The defense counsel offer only their personal opinions that these diagnosed conditions would affect Garcia's ability to perceive events and to recall them.

■ A witness's mental history is relevant to credibility if it bears on the witness's ability to perceive or to recall events or to testify accurately. *United States v. Moore,* 923 F.2d 910, 912–13 (1st Cir.1991). On the other hand, "the modern decisional trend is to not allow cross-examination into a witness's psychiatric background where such cross-examination is sought as a means of attacking the witness's credibility." *United States ex rel. Kline v. Lane,* 707 F.Supp. 368, 370 (N.D.Ill.1989). There are several reasons for why a court must inquire into more than just relevance in deciding the admissibility of a witness's mental condition:

> One's psychiatric history is an area of great personal privacy which can only be invaded in cross-examination when required in the interests of justice. This is so because cross-examination of an adverse witness on matters of such personal privacy, if of minimal probative value, is manifestly unfair and unnecessarily demeaning of the witness. Moreover, such cross-examination will generally introduce into the case a collateral issue, leading to a large amount of testimony substantially extraneous to the essential facts and issues of the controversy being tried. Because of the obvious unfairness of such a cross-examination and its needless waste of judicial time, it has been posited in an authoritative text that, "Courts should have power to protect witnesses against cross-examination that does little to impair credibility but that may damage their reputation, invade their privacy, and assault their personality." (footnote omitted). And Rule 403, Federal Rules of Evidence provides the courts with the power to do just this.

*United States v. Lopez,* 611 F.2d 44, 45 (4th Cir.1979).

■ The court should consider three factors before admitting such evidence: (1) the witness's mental condition "must have been 'at a time probatively related to the time period about which he was attempting to testify,'" (quoting *United States v. Honneus,* 508 F.2d 566, 573 (1st Cir.1974), *cert. denied,* 421 U.S. 948, 95 S.Ct. 1677, 44 L.Ed.2d 101 (1975)); (2) the witness's mental condition must bear on the capacity to observe the events in question, to testify about these observations accurately and truthfully, or to maintain a clear recollection of the observations; and (3) the witness's mental condition "must not 'introduce into the case a collateral issue which would confuse the jury and which would necessitate allowing the Government to introduce testimony explaining the matter,'" (quoting *United States v. Mucherino,*

311 F.2d 172, 174 (4th Cir.1962)). *Lopez,* 611 F.2d at 45–46; *see United States v. Moore,* 923 F.2d at 913; *United States v. Gonzalez–Sanchez,* 825 F.2d 572, 586 (1st Cir.), *cert. denied,* 484 U.S. 989, 108 S.Ct. 510, 98 L.Ed.2d 508 (1987). Since admissibility is a matter of discretion, the trial court is " 'entitled to weigh the potential prejudice of a free wheeling inquiry intended to stigmatize the witness against whatever materiality the evidence might have.' " *Lopez,* 611 F.2d at 46 (quoting *United States v. Honneus,* 508 F.2d at 573).

In *United States v. Friedman,* 854 F.2d 535, 570 (2nd Cir.1988), *cert. denied,* 490 U.S. 1004, 109 S.Ct. 1637, 104 L.Ed.2d 153 (1989), the defendant appealed arguing, *inter alia,* that the district court erred in quashing the Rule 17(c) subpoenas issued to two psychiatrists who had treated an important witness in the government's case. The district court had examined in camera the materials produced by the psychiatrists and granted the witness's motion to quash the subpoena on the materials as privileged. *United States v. Friedman,* 636 F.Supp. 462 (S.D.N.Y.1986). Avoiding the privilege issue, the appeals court affirmed agreeing with the district court that the materials did not cast doubt on the witness's ability to understand and relate the truth. 854 F.2d at 571. The appeals court further commented that the psychiatric history would have had a marginal effect, at best, on the jury's determination of credibility, because the defendants were able to cross-examine and impeach the witness on several other critical areas. 854 F.2d at 571.

In *United States v. Butt,* 955 F.2d 77 (1st Cir.1992), the defendants appealed arguing the district court erred in a series of rulings regarding a government witness's psychiatric history. The district court had reviewed in camera the psychological report on one of the government's main witnesses and, though finding nothing exculpatory in it, released two terms found in the medical report, "splitting" and "hysteroid dysphoric," and asked defense counsel to brief whether the conditions impacted witness credibility. The defendants submitted two affidavits from a psychiatrist discussing those terms and suggesting that access to the reports could be help-

ful to the defendants. The district court then disclosed the portions of the reports containing those terms. The district court, however, later denied the defendants' renewed request for further disclosure, as well as their request to have a psychiatrist testify. The First Circuit summarized the relevant law on the use of such evidence on witness credibility:

> For over forty years, federal courts have permitted the impeachment of government witnesses based on their mental condition at the time of the events testified to. *See United States v. Hiss,* 88 F.Supp. 559, 559–60 (S.D.N.Y.1950). Evidence about a prior condition of mental instability that "provide[s] some significant help to the jury in its efforts to evaluate the witness's ability to perceive or to recall events or to testify accurately" is relevant. *United States v. Moore,* 923 F.2d 910, 913 (1st Cir.1991). "The readily apparent principle is that the jury should, within reason, be informed of all matters affecting a witness's credibility...." *United States v. Partin,* 493 F.2d 750, 762 (5th Cir.1974). *See also United States v. Lindstrom,* 698 F.2d 1154, 1165–66 (11th Cir.1983).

> Despite this precedent, we are aware of no court to have found relevant an informally diagnosed depression or personality defect. Rather, federal courts appear to have found mental instability relevant to credibility only where, during the timeframe of the events testified to, the witness exhibited a pronounced disposition to lie or hallucinate, or suffered from a severe illness, such as schizophrenia, that dramatically impaired her ability to perceive and tell the truth.

955 F.2d at 82–83. In a footnote to this passage, the First Circuit observed that scholarly authorities and the Eleventh Circuit in *Lindstrom* "limit the relevancy rule to serious mental illness." 955 F.2d at 83 n. 6.

The Eleventh Circuit in *United States v. Lindstrom* reversed the district court for not allowing full cross-examination and full access to the records concerning the government's main witness's psychiatric condition and treatment. The witness was diagnosed at one time as suffering from "schizophrenic

reaction, chronic undifferentiated type." 698 F.2d at 1161. The medical records included an entry that the patient had a "history of hallucinations" and was "delusional." *Id.* at 1161–62. The court identified some of the emotional or mental defects which may be relevant on the issue of credibility or bias:

Certain forms of mental disorder have high probative value on the issue of credibility. Although the debate over the proper legal role of mental health professionals continues to rage, (footnote omitted) even those who would limit the availability of psychiatric evidence acknowledge that many types of "emotional or mental defect may materially affect the accuracy of testimony; a conservative list of such defects would have to include the psychoses, most or all of the neuroses, defects in the structure of the nervous system, mental deficiency, alcoholism, drug addiction and psychopathic personality." Juviler, *Psychiatric Opinions as to Credibility of Witnesses: A Suggested Approach,* 48 Cal.L.Rev. 648, 648 (1960). Mental illness may tend to produce bias in a witness' testimony. A psychotic's veracity may be impaired by lack of capacity to observe, correlate or recollect actual events. A paranoid person may interpret a reality skewed by suspicions, antipathies or fantasies. A schizophrenic may have difficulty distinguishing fact from fantasy and may have his memory distorted by delusions, hallucinations and paranoid thinking. A paranoid schizophrenic, though he may appear normal and his judgment on matters outside his delusional system may remain intact, may harbor delusions of grandeur or persecution that grossly distort his reactions to events.

698 F.2d at 1160. *Lindstrom* stands for a defendant's right to psychiatric records if the district court, after an in camera inspection, determines the records suggest a key witness, during the relevant time period, suffered from a "mental illness which caused her to misperceive and misinterpret the words and actions of others, and which might seriously affect her ability 'to know, comprehend and relate the truth.'" 698 F.2d at 1166 (quoting *United States v. Partin,* 493 F.2d at 762).

■ Based on all of the above precedent and on a desire to minimize delay at trial, the court will grant the defendant's subpoena requests on the following conditions. First, the clerk shall issue subpoenas to Dr. Robert Jimmenez and Veterans Center–Corpus Christi that require production to only the court on or before May 19, 1994, of all records[2] concerning the treatment, care and evaluation of Louis Albert Garcia for a emotional or mental disorder, defect or illness from 1988 through the present. Second, the court shall seal the records and view them in camera. Third, the defendants shall submit on May 13, 1994, briefs and any affidavits on the possible relevance that a "Major depressive Disorder single Episode non-psychotic" and "Post-traumatic Stress Disorder Chronic" would have on Garcia's credibility and bias. The government will have until May 19, 1994, to file its response. Fourth, the court will not disclose the relevant records, if any, until it has conducted the in camera inspection and decided any objections or assertions of privilege.

The defendants' next subpoena request is addressed to the parent company of Bowling Green Hospital, Comprehensive Addiction Programs, Inc.,[3] for "[a]ll documents regarding Louis Albert Garcia's association with Bowling Green Hospital, including but not limited to any:" employment agreements, check stubs or records of payments to Garcia, records showing the number of patients referred by Garcia, Garcia's personnel file,

---

**2.** As for "[r]ecords of the identity, diagnosis, prognosis, or treatment of ... [Garcia] which are maintained in connection with the performance of any program or activity relating to substance abuse education, prevention, training, treatment, rehabilitation or research, which is conducted, regulated, or directly or indirectly assisted by any department or agency of the United States," 42 U.S.C. § 290dd–2(b)(2), the court does not order the disclosure of these records, as the defendants have not complied with the statutory or regulatory requirements for that disclosure. *See* 42 C.F.R. § 2.61 *et seq.*

**3.** The defendants also request subpoenas for the same information from La Hacienda Hospital and the Psychiatric Institute of Fort Worth. The defendants assert that "on information and belief" Garcia also had consulting agreements with these two facilities.

documents showing services provided by Garcia, and correspondence with Garcia. The defendants argue relevance and need for these documents in preparing an effective cross-examination of Garcia regarding his admitted consulting arrangement with Bowling Green Hospital prior to November of 1990. The government has identified the arrangement at Bowling Green Hospital as possible Rule 404(b) evidence. As for the other two facilities, the defendants seek to use such evidence to rebut Garcia's assertion that he was reluctant to enter into a consulting arrangement with Parkview and to show that Garcia was holding himself out for pay to other hospitals.

■ The court grants the defendants' subpoena request for documents from Comprehensive Addiction Programs, Inc., the parent corporation of Bowling Green Hospital. Though the defendants' request is phrased broadly, the court believes there is a limited number of documents that would be relevant to their request. The court denies the defendant's Rule 17(c) request for pretrial production of documents from Psychiatric Institute of Fort Worth and La Hacienda Hospital, as speculative and unnecessary to the defendants' proper preparation for trial.

The defendants' next subpoena request is to Louis Albert Garcia for "all documents" including records of payments, remuneration, benefits or reimbursement from any hospital or health care provider other than for his own medical expenses; records showing services rendered to Parkview or any other health or mental care provider, and federal income tax returns and all schedules for the years 1988 and 1992.[4] The defendants argue that some of these documents would be relevant in showing that Garcia actually provided consulting services to Parkview and other hospitals. The tax returns are relevant on the issue of witness bias and credibility.

The court grants the defendants' subpoena request for Louis Garcia with the following modifications. The first two paragraphs of requested information are limited to records and documents relating to Parkview Hospital

or Bowling Green Hospital. The court will not permit a fishing expedition into documents relating to any other hospital or health or mental care provider. The court grants the subpoena request for tax returns on the years 1988 and 1992.

Finally, the defendants seek to subpoena from Louis Garcia's attorney, Gene Garcia, any proffers made by Louis Garcia to federal authorities concerning Parkview, all correspondence from federal authorities concerning Parkview, and all plea agreements, immunity agreements or other promises negotiated with federal authorities. The defendants argue that such documents are critical in preparing an effective cross-examination on Garcia's agreements with the government and in showing his bias. The defendants exempt from their subpoena request any privileged material if properly identified by the attorney Garcia.

The court denies the defendants' subpoena request for any proffers made on behalf of Louis Garcia and any correspondence concerning Louis Garcia's relationship with Parkview. The defendants have not shown that these documents are sufficiently likely to be relevant or to contain admissible evidence. The court grants the subpoena request for any plea agreement, immunity agreement or other agreement or promise negotiated with federal authorities that bears upon his cooperation and assistance in the investigation and prosecution of the case at hand.

### III. Production of Garcia's Presentence Report

The government's main witness, Louis Garcia, was charged by an indictment filed October 6, 1993, with fifteen counts of receiving a supplementation of his federal salary in violation of 18 U.S.C. § 209. *United States v. Louis Albert Garcia,* No. 93–40035–01–RDR. On November 23, 1993, the parties entered into a plea agreement whereby Garcia pleaded guilty to count one and the government agreed to dismiss the remaining counts in exchange for his plea and his complete and truthful cooperation in the investi-

---

4. Pursuant to the March 30th order, the government recently furnished the defendants with Gar-

cia's tax returns for the years 1989 through 1991.

gation and case. The court accepted the defendant's change of plea and ordered the probation office to prepare a presentence investigation report (PSIR). From the record in that case it appears the PSIR was completed in February of 1994 and a copy sent to the defendant. The prosecution in the instant case admits that the probation office also provided it with a copy of Garcia's PSIR. Garcia has waived his right to a speedy sentencing and the sentencing hearing has been continued.

The defendants seek two portions of Garcia's PSIR: the "Defendant's Version" and the sentence computation. The defendant argues the first portion is discoverable under *Giglio* as an inconsistent statement that is impeachment evidence and under the Jencks Act as a prior written statement that Garcia has acknowledged as an accurate account. The defendant argues the second portion of the PSIR is *Brady* material showing Garcia's bias. The government disputes that it can disclose the PSIR without a court order, that the PSIR contains any *Brady* or *Giglio* material, and that the "Defendant's Version" is a Jencks Act statement.

In *United States v. Dingle,* the Tenth Circuit held that a PSIR was "not a producible 'statement' under the Jencks Act." 546 F.2d 1378, 1380 (10th Cir.1976). The court found the need for confidentiality of a PSIR outweighed any need for discovery under the Jencks Act. *Id.* at 1380–81. The court also rejected a *Brady* request for the PSIR finding that the prosecution did not possess it. *Id.* at 1381.

Recently, the Tenth Circuit revisited whether PSIR reports are producible under the Jencks Act. *United States v. Sasser,* 971 F.2d 470, 479 (10th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1292, 122 L.Ed.2d 683 (1993). The panel observed a factual difference with *Dingle* in that the prosecution in *Sasser* admitted to having a copy of the PSIR. 971 F.2d at 480. The *Sasser* panel next noted that the Supreme Court had since held that the government did not have a privilege preventing disclosure of a PSIR. *Id.* The panel summarized the general approach taken in other circuits of permitting review of the PSIR "if it was in

the hands of a prosecutor as distinguished from the probation officer, or have ordered production of parts of the report that contain impeaching material after in camera review by the court." *Id.* (citations omitted). The panel, however, did not ask for en banc reconsideration of *Dingle* finding that the trial court's failure to disclose the PSIR, if error, was harmless. 971 F.2d at 480–81.

Because the prosecution has Garcia's PSIR, the court cannot deny disclosure under *Brady,* as the court did in *Dingle,* for the reason that the prosecution does not possess the PSIR. Still, much of what the court said in *Dingle* about the need for confidentiality of PSIRs remains the law of this circuit. After reviewing the court file in *United States v. Garcia,* No. 93–40035–01–RDR, it does not appear that the presentencing procedures have progressed to the point of giving the defendants' a colorable argument under the Jencks Act. The court directs the government to produce for the court's in camera inspection Garcia's PSIR along with a statement whether the parties have filed any objections to the PSIR.

IT IS THEREFORE ORDERED that of the in camera materials submitted on April 18, 1994, (Dk. 57) the government shall produce those documents indicated in the above order;

IT IS FURTHER ORDERED that the defendants' joint motion for issuance of subpoenas pursuant to Rule 17(c) (Dk. 55) is granted in part and denied in part as provided herein, and that the defendants shall prepare and submit promptly to the clerk subpoenas in compliance with this order;

IT IS FURTHER ORDERED that the defendants' joint motion for production of portions of Louis Garcia's presentence report (Dk. 62) is granted to the extent that the government shall submit the report to the court for its in camera inspection.