**UNITED STATES of America,**

v.

**Dean Anthony BECKFORD, Claude Gerald Dennis, Leonel Romeo Cazaco, and Richard Anthony Thomas, Defendants.**

**Criminal Nos. 3:96CR66–01, 3:96CR66–05 to 3:96CR66–07.**

United States District Court,
E.D. Virginia,
Richmond Division.

April 4, 1997.

David Novak, Stephen Miller, Andrew McBridge, Assistant United States Attorneys, Richmond, VA, for U.S.

Gerald T. Zerkin, Robert J. Wagner, Richmond, VA, for Dean Anthony Beckford.

John C. Jones, Quinton, VA, Scott Brettschneider, Kew Gardens, NY, for Claude Gerald Dennis.

Reginald M. Barley, Cary B. Bowen, Bowen & Bowen, Richmond, VA, for Leonel Romeo Cazaco.

David P. Baugh, Elizabeth D. Scher, Morchower, Luxton & Whaley, Richmond, VA, for Richard Anthony Thomas.

## MEMORANDUM OPINION

PAYNE, District Judge.

Defendants Dean Anthony Beckford, Claude Gerald Dennis, Leonel Romeo Cazaco and Richard Anthony Thomas have been charged in the Superseding Indictment with intentional murder in furtherance of a Continuing Criminal Enterprise and a drug trafficking conspiracy punishable under 21 U.S.C. § 841(b)(1)(A), in violation of 21 U.S.C. § 848(e). Pursuant to 21 U.S.C. § 848(h), the Government has notified each defendant that it intends to seek a penalty of death in the event of conviction and has posited with specificity the statutory and non-statutory aggravating factors which it will seek to prove as the basis for imposition of the death penalty. This is, then, a capital case under Section 848(e).

The defendants seek pre-trial discovery pursuant to the rules of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and *Kyles v. Whitley,* 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995), which require the Government to disclose any evidence favorable to the accused in its possession that is material to guilt or punishment. To that end, they seek the entry of various orders:

(1) Defendants Beckford, Dennis, Cazaco, and Thomas move the Court to order production of the presentence reports for all Government witnesses who have been sentenced for federal offenses;

(2) Defendants Beckford, Dennis, and Cazaco seek production of the presentence reports for specified Government witnesses who have been sentenced for state offenses;

(3) Defendants Beckford and Thomas seek production of all proffers made by any Government witness pursuant to Fed. R.Crim.P. 35 or U.S.S.G. § 5K1.1 as well as any "substantial assistance" motions made by the Government on behalf of its witnesses; and

(4) Defendant Cazaco moves the Court to order production of all plea agreements between the Government and specified uncharged co-conspirators.

The defendants assert that the evidence sought contains exculpatory and impeachment evidence, and thus that it constitutes "evidence favorable to an accused" which must be produced by the Government pursuant to *Brady v. Maryland.*

The Government resists production of this alleged *Brady* material on two bases. First, the Government asserts that most of the information sought by the defendants does not fall within the reach of *Brady* because of the nature of the information. Second, the Government asserts that much of the material which the defendants describe as *Brady* material is actually *Giglio* or *Jencks* material, which has already been the subject of a Court order (*i.e.,* Memorandum Order issued

November 8, 1996, establishing that *Giglio* and *Jencks* material must be produced three days before jury selection).

## I. BACKGROUND LEGAL PRINCIPLES

Before assessing the respective positions of the parties, it is necessary to summarize the legal principles which control disclosure by the Government of evidence in its possession. This is particularly essential here because both the Government and the defense seem to have lost sight of those controlling principles.

■ It should be noted that, in this case, the question whether the Government has a *Brady* obligation to disclose the requested information arises in a somewhat unusual posture. "In the ordinary *Brady* case, it is only after a judgment of conviction that a court reviews the failure of the prosecution to disclose material the defendant argues should have been admitted into evidence." *United States v. Cuthbertson,* 651 F.2d 189, 199 (3rd Cir.1981) (Seitz, C.J., concurring). In this case, however, *Brady* issues have arisen before trial. Nonetheless, the same standards logically apply to both an initial decision to disclose and a postconviction determination whether nondisclosure deprived a defendant of his or her due process rights at trial. *See United States v. Agurs,* 427 U.S. 97, 106–07, 96 S.Ct. 2392, 2398–99, 49 L.Ed.2d 342 (1976). It is to these controlling standards to which the Court now turns.

### A. *Brady v. Maryland*

Due Process requires that the Government disclose to the accused any favorable evidence in its possession that is material to guilt or punishment. *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 1196–97, 10 L.Ed.2d 215 (1963). "Favorable" evidence includes not only that evidence tending to exculpate the accused, but also any evidence adversely affecting the credibility of the Government's witnesses. *United States v. Bagley,* 473 U.S. 667, 676, 105 S.Ct. 3375, 3380–81, 87 L.Ed.2d 481 (1985); *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). Evidence is "material" if there is a reasonable probability that it will affect the result of the proceeding. *See Bagley,* 473 U.S. at 682, 105 S.Ct. at 3383–84. In the discharge of its obligations under *Brady,* the Government must actively search out the requested material in its files and in the files of related agencies reasonably expected to have possession of such information. *Kyles v. Whitley,* 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490(1995); *United States v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976) (holding that a defendant' failure to request favorable evidence did not leave the Government free of all obligation to disclose *Brady* material). However, "the prosecutor is not required to deliver his entire file to defense counsel, but only to disclose evidence favorable to the accused that, if suppressed, would deprive the defendant of a fair trial." *United States v. Bagley,* 473 U.S. at 675, 105 S.Ct. at 3380.

Where the Government possesses *Brady* material that it deems privileged, the accused must specifically request that it be produced, or else its production is left to "the prosecutor's decision." *Pennsylvania v. Ritchie,* 480 U.S. 39, 59, 107 S.Ct. 989, 1002, 94 L.Ed.2d 40 (1987). If, however, the accused is able to identify the requested confidential material with some degree of specificity, he may then attempt to convince the district court that it is subject to *in camera* review and/or disclosure. *Id.* at 58 n. 15, 107 S.Ct. at 1002 n. 15.

It is important to note that "[t]he Supreme Court has never pinpointed the time at which the disclosure [under *Brady*] must be made." *United States v. Anderson,* 481 F.2d 685 (4th Cir.1973), *aff'd,* 417 U.S. 211, 94 S.Ct. 2253, 41 L.Ed.2d 20 (1974). However, it is settled that "[n]o due process violation occurs as long as *Brady* material is disclosed to a defendant in time for its effective use at trial." *United States v. Smith Grading and Paving, Inc.,* 760 F.2d 527, 531 (4th Cir.), *cert. denied sub nom., Dellinger. Inc. v. United States,* 474 U.S. 1005, 106 S.Ct. 524, 88 L.Ed.2d 457 (1985); *see also United States v. Pollack,* 534 F.2d 964, 973 (D.C.Cir.) ("Disclosure by the government must allow the defense to use that favorable material effectively in the preparation and presentation of its case, even if satisfaction of this criterion requires pre-trial disclosure.") (cit-

ing *United States v. Elmore*, 423 F.2d 775, 779 (4th Cir.1970)), *cert. denied*, 429 U.S. 924, 97 S.Ct. 324, 50 L.Ed.2d 292 (1976). Of course, "[d]isclosure to be effective must be made at a time when the disclosure would be of value to the accused." *United States v. Shifflett*, 798 F.Supp. 354, 355 (W.D.Va.1992) (citing *United States v. Elmore*, 423 F.2d 775, 779 (4th Cir.) *cert. denied*, 400 U.S. 825, 91 S.Ct. 49, 27 L.Ed.2d 54 (1970)).

### B. *Giglio v. United States*

In *Giglio v. U.S.*, 405 U.S. 150, 155, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972), the Supreme Court brought within the due process requirements enunciated in *Brady* the right of defendants to secure from the prosecution disclosure of materials affecting the credibility of Government witnesses, such as, but not limited to, plea agreements, promises of leniency by the Government, inducements to testify, and financial assistance offered by the Government. In *United States v. Bagley*, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985), the Supreme Court reaffirmed the holding in *Giglio* and, in so doing, expressly disavowed any difference between exculpatory and impeachment evidence for *Brady* purposes. 473 U.S. at 676, 105 S.Ct. at 3380 ("This Court has rejected any [ ] distinction between impeachment evidence and exculpatory evidence.").

■ Disclosure of *Giglio/Bagley* impeachment material (hereinafter "*Giglio* material") is governed by the same legal principles which animate the disclosure of *Brady* material. This is necessarily the case because *Giglio* material is merely a sub-set of the universe which comprises *Brady* material. The Supreme Court repeatedly has made clear that "evidence favorable to an accused" under *Brady* consists of both exculpatory evidence and impeachment evidence.

Impeachment evidence, [ ] as well as exculpatory evidence, falls within the *Brady* rule. *See Giglio v. United States*, 405 U.S.

[at 154] [92 S.Ct. at 766]. Such evidence is "evidence favorable to an accused," *Brady*, 373 U.S. [at 87] [83 S.Ct. at 1196], so that, if disclosed and used effectively, it may make the difference between conviction and acquittal.

*United States v. Bagley*, 473 U.S. at 676, 105 S.Ct. at 3380 (*citing Napue v. Illinois*, 360 U.S. 264, 269, 79 S.Ct. 1173, 1177, 3 L.Ed.2d 1217 (1959)); *see also Id.* ("This Court has rejected any [ ] distinction between impeachment evidence and exculpatory evidence."); *Giglio v. United States*, 405 U.S. at 154, 92 S.Ct. at 765 ("When the reliability of a given witness may well be determinative of guilt or innocence, nondisclosure of evidence affecting credibility falls within th[e] general rule [of *Brady*]."); *Kyles v. Whitley*, 514 U.S. at 433, 115 S.Ct. at 1565 ("The Court [has] disavowed any difference between exculpatory and impeachment evidence for *Brady* purposes.").

The Fourth Circuit also has consistently held that *Brady*, through its progeny (*Giglio* and *Bagley* ), requires the disclosure of both exculpatory and impeachment evidence that is material. *See, e.g. United States v. Trevino*, 89 F.3d 187, 189 (4th Cir.1996) (" 'Favorable' evidence [under *Brady*] includes not only that evidence tending to exculpate the accuse, but also any evidence adversely affecting the credibility of the government's witnesses.") (*citing Bagley*, 473 U.S. at 676, 105 S.Ct. at 3380; *Giglio*, 405 U.S. at 154–55, 92 S.Ct. at 765–66); *United States v. Hoyte*, 51 F.3d 1239, 1242–43 (4th Cir.) ("If we consider [the witness'] undisclosed statement as false, it may be favorable to the defendants [under *Brady* ] in the sense of impeaching [the witness'] testimony."), *cert. denied*, —— U.S. ——, 116 S.Ct. 346, 133 L.Ed.2d 242 (1995); *Boone v. Paderick*, 541 F.2d 447 (4th Cir.1976) ("failure to disclose [impeachment] evidence was a violation of *Giglio* and *Brady*."), *cert. denied*, 430 U.S. 959, 97 S.Ct. 1610, 51 L.Ed.2d 811 (1977).[1]

---

**1.** *See also United States v. Marva Maid Dairy*, 974 F.2d 1333, 1992 WL 224928 at *8 (4th Cir.1992) (unpublished) ("*Brady* also requires the disclosure of impeachment evidence that is material."), *cert. denied*, 507 U.S. 985, 113 S.Ct. 1580, 123 L.Ed.2d 148 (1993); *United States v. Starusko*, 729 F.2d 256, 260 (3rd Cir.1984) ("Exculpatory

evidence includes material that goes to the heart of the defendant's guilt or innocence as well as that which might well alter the jury's judgment of the credibility of a crucial prosecution witness."); *United States v. Presser*, 844 F.2d 1275, 1282 (6th Cir.1988) ("The [Supreme] Court's decisions in both *Giglio* and *Bagley* are consistent

Indeed, the Fourth Circuit has recently recognized that the Supreme Court's decision in *Giglio* "made clear in 1972 that evidence tending to cast doubt upon the credibility of a government witness should be disclosed under *Brady*." *Jean v. Collins*, 107 F.3d 1111, 1115 (4th Cir.1997). Therefore, *Giglio/Bagley* impeachment material, like all other *Brady* material, must be "disclosed to a defendant in time for its effective use at trial." *United States v. Smith Grading and Paving, Inc.*, 760 F.2d at 531.

## C. The Jencks Act

The Jencks Act, 18 U.S.C. § 3500 (codifying *Jencks v. United States*, 353 U.S. 657, 77 S.Ct. 1007, 1 L.Ed.2d 1103 (1957)), governs the production of statements made by Government witnesses. The Act specifies the scope of production by providing that the United States must produce "any statement (as hereinafter defined) of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified." 18 U.S.C. § 3500(b). A "statement" is defined as: (1) a written statement made by the witness and signed or otherwise adopted or approved by him; (2) a substantially verbatim transcription and contemporaneous recording of the oral statement of the witness; or (3) a statement made by the witness to the grand jury. 18 U.S.C. § 3500(e).

The *Jencks* Act prescribes the time at which production of statements must be made by requiring the Government to produce a witness' statement only after that witness has testified on direct examination. *See* 18 U.S.C. § 3500(a) ("In any criminal prosecution brought by the United States, *no statement or report in the possession of the United States* which was made by a Government witness or prospective witness (other than the defendant) shall be the subject or subpoena, discovery, or inspection *until said witness has testified on direct examination in the trial of the case*") (emphasis added). And, a district court may not order the disclosure of *Jencks* material earlier than pro-

vided by statute. *See United States v. Lewis*, 35 F.3d 148, 151 (4th Cir.1994) (district court may not "require the government to produce Jencks Act material relating to one of its witnesses until after the witness has testified.") (*citing United States v. Peterson*, 524 F.2d 167, 175 (4th Cir.1975), *cert. denied*, 423 U.S. 1088, 96 S.Ct. 881, 47 L.Ed.2d 99 (1976); *United States v. Harris*, 458 F.2d 670, 679 (5th Cir.) ("a *Jencks* Act request is wholly inappropriate in a pretrial motion for discovery"), *cert. denied*, 409 U.S. 888, 93 S.Ct. 195, 34 L.Ed.2d 145 (1972)), *cert. denied*, 423 U.S. 1088, 96 S.Ct. 881, 47 L.Ed.2d 99 (1976).

The disparate treatment respecting the timing of disclosure of witness statements under the *Jencks* Act and "evidence favorable to an accused" under *Brady* and its lineage generally has been justified by the courts as necessary to protect Government witnesses. For example, the Fourth Circuit, sitting *en banc*, has explained:

When the statements of persons other than the defendant are sought, questions of witness safety necessarily arise. The phrase "witness safety" incorporates our concerns about those persons whose inculpatory statements may be introduced at trial .... the disclosure of co-conspirator statements may expose not only the declarant to threats and intimidation, but also those expected to testify at trial concerning the declarant's statements. [Pretrial production would] endanger government witnesses by circumventing the protections of the *Jencks* Act, and we reject it.

*United States v. Roberts*, 811 F.2d 257, 259 (4th Cir.1987) (en banc). The courts, therefore, have strictly enforced the provisions of the *Jencks* Act. *See United States v. Lewis*, 35 F.3d at 151.

## II. FAVORABLE EVIDENCE WHICH IS BOTH EXCULPATORY AND IMPEACHING: THE OVERLAP BETWEEN GENERAL *BRADY* MATERIAL AND *GIGLIO/BAGLEY* MATERIAL

As explained above, *Brady* material consists primarily of two types of evidence:

with the tenet on which the *Brady* doctrine is based, that it is fundamentally unfair for the government to achieve a conviction through the

concealment of evidence which under mines the strength of the government's case against the defendant.").

(1) *exculpatory evidence*, which goes to the heart of the defendant's guilt or innocence, *see Brady*, 373 U.S. at 87, 83 S.Ct. at 1196–97; and (2) impeachment evidence, which may affect the jury's assessment of the credibility of a prosecution witness, *see Giglio*, 405 U.S. at 154–55, 92 S.Ct. at 766; *Bagley*, 473 U.S. at 676, 105 S.Ct. at 3380.[2] Of course, *Brady* material may encompass both exculpatory and impeachment evidence. Indeed, there is no "artificial bright-line between impeachment and exculpatory evidence." *Jean v. Collins*, 107 F.3d at 1115, (4th Cir.1997). As discussed above, however, disclosure of all *Brady* material, including *Giglio* impeachment material, is governed by the same legal principle: evidence favorable to a defendant must be disclosed "in time for its effective use at trial." *United States v. Smith Grading and Paving, Inc.*, 760 F.2d at 531. The determination of the precise time at which *Brady* material must be disclosed is necessarily governed by the specific nature of the *Brady* material at issue—*i.e.*, whether it is exculpatory or merely impeachment evidence.

■ The Court previously has ordered the Government to produce pure impeachment material (records of conviction, plea agreements, immunity agreements and the like) at least three business days in advance of jury selection. *See* Memorandum Order, November 8, 1996 at 4–5. Production at that time will provide the defendants with ample opportunity for review and effective use of the impeaching evidence required to be produced by *Giglio*. That determination is based on the fact that while *Giglio* material may have considerable impeachment value, the nature of that material usually does not require substantial advance time to prepare for its effective use at trial. *See Id.* at 4 (*citing United States v. Witherspoon*, 16 F.3d 414, 1994 WL 5136 (4th Cir.)) (no due process violation when Government's intention to make a substantial assistance motion was disclosed after jury selection rather than before trial because such disclosure provided sufficient time for defendants to use during cross examination), *cert. denied*, 512 U.S. 1225, 114 S.Ct. 2720, 129 L.Ed.2d 845 (1994); *United States v. Ridings*, 931 F.2d 888, 1991 WL 65538 (4th Cir.) (where testimony agreement was disclosed on the morning that the government put on evidence pursuant to a court-order, disclosure sufficiently permitted effective use at trial), *cert. denied*, 502 U.S. 916, 112 S.Ct. 320, 116 L.Ed.2d 261 (1991); *United States v. Shifflett*, 798 F.Supp. 354 (W.D.Va.1992) (no constitutional violation to disclose criminal records of witnesses after they testified on direct examination because the nature of the materials permitted its effective use if available for cross-examination) (citations omitted).

■ Moreover, the disclosure of *Giglio* material in useful form also serves (except in highly unusual situations) to identify the witnesses to whom the material relates. This, of course, necessitates that the time of disclo-

---

**2.** At oral argument, the Government erroneously cited *United States v. Hoyte*, 51 F.3d 1239 (4th Cir.), *cert. denied*, —— U.S. ——, 116 S.Ct. 346, 133 L.Ed.2d 242 (1995), for the proposition that where evidence is *Giglio* impeachment material, that evidence falls outside the purview of the *Brady* doctrine. The Government's argument rather substantially misreads *Hoyte*.

In *Hoyte*, the Fourth Circuit considered the defendants' claim that the Government's failure to disclose a witness' account of the murder at issue violated their due process rights under *Brady*. The Court of Appeals stated: "To prevail on this issue, the defendants must show the undisclosed statement is both favorable to them and material." *Id.* at 1242. After setting forth the standard for assessing the materiality of the witness account at issue, the court evaluated whether the evidence was "favorable" to the defense under *Brady*:

If we consider [the witness'] undisclosed story as true, it is clear it is not favorable in the sense it does not specifically exculpate anyone.... If we consider [t]he undisclosed statement as false, it may be favorable to the defendants in the sense of *impeaching* [the witness'] testimony. *See Giglio v. United States*, 405 U.S. [at 154–55] [92 S.Ct. at 765–66].

*Id.* (emphasis added). As evinced by the Court of Appeals' analysis in *Hoyte*, evidence can be "favorable" under *Brady* in two senses—either by exculpating the defendant or by impeaching a Government witness. It is clear from the Fourth Circuit's analysis, then, that far from comprising separate and distinct bodies of evidence, the *Brady* doctrine *encompasses* both *Giglio* impeachment material and exculpatory evidence. The Government's argument to the contrary is merely a misguided attempt to "draw an artificial bright-line between impeachment and exculpatory evidence." *Jean v. Collins*, 107 F.3d at 1115.

sure take into account such factors as the risk to witnesses.

■ Unlike pure impeachment evidence, however, exculpatory evidence may require significant pre-trial investigation in order to be useful to the defendant at trial. For example, an exculpatory witness statement providing an alibi or the identification of a likely alternative perpetrator of the crime for which the defendant is charged may require disclosure at an earlier date in order to be effectively used in the defense. Thus, depending upon the case specific considerations outlined below in Section III, the Government is ordinarily required to produce exculpatory evidence well before its disclosure of pure *Giglio* material. And, in recognition of its *Brady* obligations, the Government began to produce exculpatory *Brady* material in this case in October, 1996, nearly seven months before trial.

At issue here, however, is the scope of the Government's obligations to produce certain kinds of evidence which the defense asserts is both impeachment and exculpatory evidence. For the reasons set forth above, the Court's November 8, 1996 Order, requiring that *Giglio* material was producible three days before jury selection, is addressed only to pure impeachment evidence. Therefore, *Brady* evidence which is both exculpatory *and* impeaching falls outside the purview of the Court's previous Order, and it shall be produced in accordance with *Brady v. Maryland* as explained in this section and III of this Memorandum Opinion.[3]

## III. EXCULPATORY WITNESS STATEMENTS: THE OVERLAP BETWEEN *BRADY* AND THE JENCKS ACT

■ Many of the defendants' requests in this case appears to implicate both *Brady*

and its progeny, which require disclosure of exculpatory and impeachment information in order to allow the defense to make effective use of it at trial, and the *Jencks* Act, which allows statements made by Government witnesses to be withheld until after they have testified on direct examination. Requests for information falling in both categories create somewhat different problems respecting the timing of disclosure. There is undoubtedly a tension between *Brady* and the *Jencks* Act with respect to the *timing of production,* because:

[i]t is conceivable that disclosure of material covered by the *Jencks* Act may be required, under *Brady* and the due process clause, to be made to the defendant before trial in order that the defendant might prepare and present an effective defense.

*United States v. Ruiz,* 702 F.Supp. 1066, 1069 (S.D.N.Y.1989), *aff'd,* 849 F.2d 501 (2nd Cir.1990). The tension arises, or is most pronounced, where there is overlap between the *Jencks* Act and the *Brady* doctrine. *Jencks* Act statements may, but do not always, also constitute exculpatory or impeachment evidence. *See United States v. Owens,* 933 F.Supp. 76, 80, 84 (D.Mass.1996) (distinguishing between *Jencks* statements which are exculpatory and those which are not). However, where a *Jencks* statement *is* exculpatory or impeaching, the statement covered by the Jencks Act also constitutes *Brady* material as well.

This inherent potential for conflict between *Brady* and the *Jencks* Act "has caused a split in the federal circuits, and the Fourth Circuit has yet to decide the issue." *United States v. Shifflett,* 798 F.Supp. 354 (W.D.Va.1992); *see also United States v. Owens,* 933 F.Supp.

---

3. Indeed, the Fourth Circuit recently has recognized that where *Brady* evidence is both exculpatory and impeaching, it must be disclosed in time for the defendant to make effective use of its exculpatory information. The Court of Appeals reasoned:

[W]e believe that appellees draw an artificial bright-line between impeachment and exculpatory evidence. They fail to recognize that the evidence that the eyewitnesses against Jean had their memories enhanced and influenced by hypnosis has both exculpatory and im-

peachment implications. Certainly the hypnosis could have been used to provide material for cross-examination of the eye-witnesses. It could also have been used to show that, prior to the suggestive procedures, the descriptions given by the witnesses were of a person other than Jean. *This aspect makes the evidence exculpatory and not merely relevant for impeachment.*

*Jean v. Collins,* 107 F.3d at 1115 (emphasis added).

76, 84 (D.Mass.1996) ("[T]he law concerning exculpatory statements under the *Jencks* Act is far from clear"); *United States v. Campagnuolo*, 592 F.2d 852, 860 (5th Cir.1979) ("Our prior cases might be read as holding that *Brady* and the timing provisions of the *Jencks* Act are compatible as a matter of law. Alternatively, they might hold that *Brady* would override the *Jencks* Act where lack of pretrial discovery resulted in prejudice to the defendant of substantial Due Process character."). This unresolved issue, however, is squarely before this Court by virtue of the defendants' motions for pretrial production of certain kinds of information.

The conflict between the *Jencks* Act and the *Brady* doctrine is complicated in this case because of the nature of the Government's response to the defendants, *Brady* motions. The Government's position is simply that, where evidence constitutes *Jencks* material, it falls outside the purview of *Brady*, and is thus barred from production until completion of the witness' direct testimony. The Government, then, perceives a clean break between that which constitutes a *Jencks* statement and that which is *Brady* material. The defendants have taken the opposite, but equally simplistic, position that *Brady* material cannot also be *Jencks* Act material, and thus that all "favorable evidence to an accused" must be turned over as required by *Brady* and its progeny. Neither the Government nor the defendants have addressed, at oral argument or in their papers, which doctrine controls where the information requested is both *Jencks* and *Brady* material.

The Court finds this issue to be significantly more complex than do the parties. Indeed, resolution of the tension between the *Jencks* Act and *Brady* requires assessment of the conflicting rules and the significant interests which each seeks to further.

## A. Fourth Circuit Decisions Which Guide The Inquiry

As the district court in *Shifflett* correctly noted, the Fourth Circuit has not decided whether *Brady* or the *Jencks* Act enjoys primacy where evidence constitutes both *Brady* and *Jencks* material. In 1979, the Fourth Circuit expressly declined to reach that issue in *United States v. Klauber*, 611 F.2d 512 (4th Cir.1979), *cert. denied*, 446 U.S. 908, 100 S.Ct. 1835, 64 L.Ed.2d 261 (1980). There, when deciding that the Jencks Act does not apply to statements made by persons not expected to testify as Government witnesses, the Court of Appeals stated: "Whether [the Jencks Act] would be a bar [to disclosure] up until the time when the witness had actually testified at trial if the government had proposed to call [him] as a witness, but the Grand Jury testimony of [the witness] contained material exculpatory of [the defendant], is a question we are not called upon to address." *Klauber*, 611 F.2d at 515.

Since *Klauber*, however, the Fourth Circuit has recognized that the prosecution's *Brady* obligations are broader than those under the *Jencks* Act. *See United States v. Williams*, 10 F.3d 1070, 1079 (4th Cir.1993) (explaining that, in the context of discovery preceding a suppression hearing, the *Jencks* Act "in no way impairs the government's constitutional obligations under *Brady v. Maryland*."), *cert. denied*, 513 U.S. 926, 115 S.Ct. 313, 130 L.Ed.2d 276 (1994); *United States v. Hinton*, 719 F.2d 711, 720 (4th Cir.1983) ("[T]he duty [ ] does not rest only on the Jencks Act ..., the duty rests as well on the *Brady* requirement that material favorable to a defendant be disclosed ..."), *cert. denied*, 465 U.S. 1032, 104 S.Ct. 1300, 79 L.Ed.2d 699 (1984).

In *United States v. Kelly*, 35 F.3d 929 (4th Cir.1994), the Fourth Circuit was faced with a defense request for a letter which constituted both *Brady* and Jencks Act material. The Government had not disclosed the letter pursuant to either *Brady* or the *Jencks* Act. The Court of Appeals held that it was improper for the Government not to have disclosed the letter under *Brady*, and therefore it reversed the conviction. Because the letter was not produced *at all*, however, the Court of Appeals did not address whether the timing of production would be governed by *Brady* (*i.e.*, at a time for defendants to effectively use letter at trial) or by the *Jencks* Act (*i.e.*, after direct examination of the letter's author).

The Fourth Circuit most recently weighed-in on this issue in *United States v. Trevino*, 89 F.3d 187 (4th Cir.1996), wherein the court, in *dicta*, hinted that, where information was both *Brady* and *Jencks* material, the *Jencks* Act governs the timing of disclosure. In *Trevino*, the Court of Appeals observed that "favorable evidence" to the defense under *Brady* includes "not only that evidence tending to exculpate the accused, but also any evidence adversely affecting the credibility of the government's witnesses." *Id.* at 189 (*citing United States v. Bagley*, 473 U.S. at 676, 105 S.Ct. at 3380; *Giglio v. United States*, 405 U.S. at 154–55, 92 S.Ct. at 766). As a footnote to that sentence, however, the Court of Appeals stated:

> Where the source of the potential impeachment material is the witness's own prior statement, the government is not required to disclose the statement to the accused until concluding its direct examination of the witness.

*Id.* at 189 n. 2 (*citing* 18 U.S.C. § 3500; *United States v. Lewis*, 35 F.3d at 151). While the *Trevino* decision strongly suggests that, as to the timing of disclosure, the *Jencks* Act would control over the *Brady* doctrine, it comes far from actually confronting that issue, and its teachings are obscured by the aforementioned dicta in both *Williams* and *Hinton*.

### B. Split In Authority Concerning the Resolution of the Tension Between *Brady* and the Jencks Act

In other circuits, the overlap between the *Brady* doctrine and the *Jencks* Act has spawned a substantial, albeit inconsistent, body of law respecting the timing of disclosure. At least five circuits have held that where evidence is both *Brady* and *Jencks* material, the *Jencks* Act controls the timing of its disclosure, and thus that the Government is not required to disclose the evidence until after direct examination. *See United States v. Presser*, 844 F.2d 1275, 1283 (6th Cir.1988) ("If impeachment evidence is within the ambit of the *Jencks* Act, then ... neither *Giglio* nor *Bagley* alter the [*Jencks* Act's] statutory mandate"); *United States v. Scott*, 524 F.2d 465, 467–68 (5th Cir.1975) ("This Court and others have recognized that the rule announced in *Brady* is not a pretrial remedy and was not intended to override the mandate of the *Jencks* Act"); *United States v. Jones*, 612 F.2d 453, 455 (9th Cir.1979) ("*Brady* does not overcome the strictures of the *Jencks* Act. When the defense seeks evidence which qualifies as both *Jencks* Act and *Brady* material, the *Jencks* Act standards control."), *cert. denied*, 445 U.S. 966, 100 S.Ct. 1656, 64 L.Ed.2d 242 (1980); *United States v. Kaplan*, 554 F.2d 577 (3rd Cir.1977) (same); *United States v. Pollack*, 534 F.2d at 973 (where evidence is both *Brady* and *Jencks* material, "the government could have withheld [it] until after the witness had taken the stand in this case, 18 U.S.C. § 3500.").

Other circuits, however, have held that the constitutional dictates of *Brady*, not the *Jencks* Act, govern the disclosure of evidence which is both *Brady* and *Jencks* material. *See, e.g. United States v. Starusko*, 729 F.2d 256, 263 (3rd Cir.1984) ("compliance with the statutory requirements of the *Jencks* Act does not necessarily satisfy the due process concerns of *Brady*"); *United States v. Tarantino*, 846 F.2d 1384, 1414–15 n. 11 (D.C.Cir.1988) (*Jencks* Act limitations on discovery do not lessen the Government's *Brady* obligations to disclose exculpatory material), *cert. denied*, 488 U.S. 867, 109 S.Ct. 174, 102 L.Ed.2d 143 (1988); *United States v. Owens*, 933 F.Supp. 76, 84 (D.Mass.1996) ("Given the important nature of the constitutional rights at stake, this Court rules that the *Brady* requirement must effectively trump the *Jencks* Act where the two are in direct conflict."); *United States v. Thevis*, 84 F.R.D. 47, 54 (N.D.Ga.1979) ("In the face of this conflict [between *Brady* and the *Jencks* Act], this Court believes that the better rule requires the pretrial disclosure of *Brady* material in accordance with the timetable set forth in this order even though that material is part of a *Jencks* Act statement."). This approach is grounded in the concept of Constitutional primacy.

### C. The "Balancing" Approach

Some courts have adopted a "balancing approach" to resolve the conflict between *Brady* and the *Jencks* Act when material is both a witness statement and exculpatory of

the defendant or impeaching of a Government witness. This approach is best illustrated by the district court's analysis in *United States v. Shifflett*, 798 F.Supp. 354, 356–58 (W.D.Va.1992). There, the district court quoted with approval the balancing approach set forth by the D.C. Circuit:

> Application of a strict rule in this area would inevitably produce some situations in which late disclosure would emasculate the effects of *Brady* or other situations in which premature disclosure would unnecessarily encourage those dangers that militate against extensive discovery in criminal cases, *e.g.* potential for manufacture of evidence or bribing of witnesses. Courts can do little more in determining the proper time for disclosure than balance in each case the potential dangers of early discovery against the need that *Brady* purports to serve of avoiding wrongful convictions.

*United States v. Pollack*, 534 F.2d at 973–74. The *Shifflett* Court concluded: *"The rationale that emerges, therefore, is that the due process requirements of Brady must be met early enough to allow the defense to make effective use of the exculpatory statements at trial, while at the same time the dangers that the Jencks Act seeks to control must be minimized."* *Shifflett*, 798 F.Supp. at 356–57.

Other courts have adopted a similar balancing approach in resolving the tension between *Brady* and the *Jencks* Act. *See, e.g. United States v. Tarantino*, 846 F.2d at 1414 n. 11, 1416–1417 (recognizing overlap between *Brady* and *Jencks* material and balancing the interests underlying both doctrines); *United States v. Martino*, 648 F.2d 367, 384 (5th Cir.1981) ("when alleged *Brady* material is contained in *Jencks* Act material, disclosure is *generally* timely if the government complies with the *Jencks* Act") (emphasis added), *cert. denied*, 456 U.S. 949, 102 S.Ct. 2020, 72 L.Ed.2d 474 (1982); *United States v. Ruiz*, 702 F.Supp. 1066, 1069 (same).

■■■ Having reflected upon the conflicting views summarized above, the Court concludes that conflicts between the important competing considerations which underlie the *Jencks* and *Brady* doctrines are best resolved by employing a balancing analysis that takes into account the facts of each case. For that reason, the polarized, bright line rules reflected in the circuit split are to be eschewed.[4] This approach finds support in the history of both the *Jencks* Act and the *Brady* doctrine.

In 1957, when Congress codified the Supreme Court's decision in *Jencks v. United States*, 353 U.S. 657, 77 S.Ct. 1007, 1 L.Ed.2d 1103 (1957), Congress made a judgment that defendants' rights were sufficiently protected when Government witness' statements are produced immediately after direct examination. At the same time, Congress recognized that effective use of a statement might not be possible under that timing regime. Therefore, Congress conferred upon the district courts the discretion to "recess proceedings in the trial for such time as it may determine to be reasonably required for the examination of such statement by said defendant and his preparation for it use in trial." 18 U.S.C. § 3500(c).

In effect, then, Congress has established a statutory presumption that provision of *Jencks* Act material (*e.g.*, statements previously given by Government witnesses) upon completion of direct examination will be reasonable to permit effective use at trial. However, recognizing that this may not always be true, Congress established a method for addressing circumstances where disclosure at that time is not sufficiently enabling to the defendant. Where the witness statement is not exculpatory or impeaching in nature, district courts may not displace that statutory presumption or the scheme adopted to redress its sometimes difficult consequences. *See United States v. Lewis*, 35 F.3d at 151. For that reason, the district courts may not compel early disclosure of witness statements that are neither exculpatory nor impeaching.

However, some six years after the *Jencks* Act was enacted, the Supreme Court decided

---

**4.** It must be noted, however, that the application of a balancing approach necessarily will result, on occasion, in the modification of the statutory strictures of the *Jencks* Act in order to assure that the important objectives of *Brady* are achieved.

*Brady v. Maryland.* Of course, the decision in *Brady* does not discuss witness statements or any potential conflict between the rule in *Brady* and the *Jencks* Act. Nor were *Jencks* statements exempted from the Supreme Court's holding in *Brady.* That is not surprising, however, considering that *Brady* was a state case which, of course, did not implicate the *Jencks* Act.

Without belaboring the point, it is well to remember that *Brady* announces a rule of constitutional due process which has been expanded by ensuing decisions so that now the Due Process Clause confers upon defendants the absolute right to production of both exculpatory and impeachment material. And, neither *Brady, Giglio,* nor *Bagley* remotely suggest that the constitutional rights they articulated are subject to time limitations imposed by Congress. Nor, of course, is that constitutionally permissible. Rather, *Brady* and its progeny require the prosecution and, if necessary, the federal courts, to assure that exculpatory and impeachment material is disclosed to defendants in time for it to be effectively used. That is how the constitutional right is given effect.

██ The predicate of the now well-settled approach to the timing of disclosure under *Brady* is that the timing decision will differ from case to case. In other words, the timing decision must be made in perspective of considerations presented by specific factual circumstances in specific cases. Those considerations generally include: (1) the identity and role of the person making the statement; (2) the realistic risks to that person; (3) the nature of the statement itself and how far in advance of trial disclosure must be made in order to permit effective use of that sort of material; (4) the volume of material; and (5) the nature and extent of the charges.

██ These factors, of course, are not exclusive; undoubtedly, each case will present additional considerations to be assessed as part of the timing calculus. Rather, these factors are merely representative of the issues which should be taken into account. Nor are these factors always amenable to equal weighting; for, in a particular case, one factor may assume greater importance with respect to the other factors. The proper approach requires recognition that the rights involved are of constitutional origin and that the effectuation of those rights will depend on timing to the extent that timing affects the effective use of the disclosed material.

██ It is important, however, to remain mindful that the determination of "effective use" should not be judged solely from the perspective of the defense counsel. Lawyers, of course, always would prefer to know information well in advance of trial. But, countervailing considerations may necessitate delayed disclosure. For example, if the statement of a witness exonerated Defendant A but inculpated another suspect B who has a history of violence, pretrial disclosure of the statement to Defendant A might expose the witness to a great risk of threat or harm from suspect B. The safety of the witness in this scenario is, of course, of great importance to both Defendant A and the witness. In this, and other like circumstances, the timing of disclosure must take into account the defendant's and witness' interests.

██ Moreover, the rights conferred by *Brady* and its progeny are not absolute except as to the need for *disclosure.* With respect to *timing,* those rights are relative to the fundamental societal interest in a fair trial which produces a rational decision based on all admissible evidence. Indeed, society's interest in a fair trial lies at the heart of the *Brady* doctrine itself. *See Kyles v. Whitley,* 514 U.S. at 441–42, 115 S.Ct. at 1569 (requiring the Government to "disclose a favorable piece of evidence ... will tend to preserve the criminal trial, as distinct from the prosecution's private deliberations, as the chosen forum for ascertaining the truth about criminal accusations."); *see also United States v. Leon,* 468 U.S. 897, 900–01, 104 S.Ct. 3405, 3409, 82 L.Ed.2d 677 (1984) (recognizing general goal of establishing "procedures under which criminal defendants are acquitted or convicted *on the basis of all the evidence which exposes the truth.*") (emphasis added) (internal quotations and citations omitted); *United States v. Figurski,* 545 F.2d 389, 391 (4th Cir.1976) (recognizing the "basic concern of American criminal jurisprudence that a

defendant be convicted on nothing less than the full truth").

That interest is severely diminished if important testimonial evidence is lost because a witness disappears out of fear or is threatened, injured or killed. Therefore, in some instances, the disclosure of *Brady* material must be delayed somewhat in furtherance of society's interest in a fair trial on the basis of all relevant evidence. That, of course, may not always inure to the benefit of a particular defendant in a specific case, but that notion is at the root of the constitutional concept of a fair trial. Indeed, fairness does not of necessity connote advantage.

In sum, the Supreme Court's decision in *Brady* to entrust the timing of disclosure to the district courts on a case-by-case basis evinces a relativity that requires consideration of factors beyond those which benefit only a defendant. Otherwise, disclosure would have been required immediately upon ascertainment of *Brady* evidence by the prosecution, because it is axiomatic that, within reason, the earlier one has information, the greater the use which can be made of it. And, of course, the Supreme Court could have imposed a requirement of immediate disclosure. That the Court chose not to do so is persuasive support for consideration of interests other than those of the defendant in making the timing decision.

Moreover, where the *Jencks* Act is implicated, it is important to keep in mind that, as explained above, Congress has established a presumption of effectiveness as to witness statements. This statutory presumption is entitled to great deference from the courts, even in situations where a witness statement constitutes both *Jencks* and *Brady* material. Moreover, the policies behind the *Jencks* Act's late disclosure requirement (*e.g.* witness protection) are of the utmost importance.

For the foregoing reasons, it is especially sensible to use the balancing approach set forth in *Shifflett* to resolve the tension between the two doctrines, with the caveat that

disclosure in accordance with the statutory mandate of the *Jencks* Act must be accorded a significant place in the striking of the balance respecting disclosure of witness statements. *See United States v. Ruiz*, 702 F.Supp. at 1069 (defendant must set forth a "compelling reason" to "justify a departure from the clear mandate of 18 U.S.C. § 3500").

## D. Application of the Balance In This Case

The Government has volunteered to provide *Jencks* material long before the *Jencks* Act requires its production. Specifically, the Government has agreed to produce *Jencks* material three business days before the commencement of jury selection, which is set for May 27, 1997. The Government is scheduled to commence the presentation of its case-in-chief on June 9, 1997. Therefore, the defendants will have all *Jencks* material *18 days* before any prosecution witness takes the stand.[5]

In this case, the balancing of the interests underlying *Brady* and *Jencks* does not require, except in the limited circumstances set forth below, that disclosure of evidence constituting both *Brady* and *Jencks* material be made earlier than is provided by the *Jencks* Act, as modified by the Government's previous agreement to provide disclosure at an earlier date. First, as previously determined, premature, wholesale disclosure of witness statements, even those containing exculpatory or impeachment information, would vitiate an important function of the *Jencks* Act—the protection of Government witnesses from influence, threats, harassment, and physical harm. *See* Memorandum Order, November 8, 1996 at 7; *see also United ed States v. Presser*, 844 F.2d at 1285; *United ed States v. Thevis*, 84 F.R.D. at 53; *United States v. Stroop*, 121 F.R.D. 269, 275 (E.D.N.C.1988). The defendants here are alleged to be members of an extensive drug trafficking organization that routinely murdered those who impeded their drug traffick-

---

5. Moreover, the defendants will, in fact, be provided a large amount of *Jencks* material far earlier than three days before jury selection. At oral argument, the Government stated its intention to produce immediately all *Jencks* statements by witnesses whose safety will not be threatened by early disclosure of their identity.

ing objectives. For example, the indictment charges five of the defendants with seven murders and makes reference to additional homicides. And, there appears to be significant support for those charges. Moreover, although some Government witnesses are in the witness protection program, the vast majority continue to live without such protection in areas where the defendants have committed violence. Identification of Government witnesses will increase significantly the danger to them. That danger is magnified materially in this case because one of the organization's principal leaders, Devon Dale Beckford, who most likely will face the death penalty, remains at-large. So too do other indicted members of the organization.

In this respect, this case differs sharply from *Shifflett,* where the Government witnesses were Government agents. *See* 798 F.Supp. at 357 (' In this case, the dangers of early discovery appear to be minor. The witnesses ... are government agents; therefor, they are not likely candidates for threats or bribery"). Moreover, the defendants here suggest no "compelling reason" why in most instances production of witness statements at least 18 days before the Government's case-in-chief begins is not sufficient under *Brady*.[6]

Considering the nature, extent and seriousness of the charges, however, and taking into account the need for time to develop supporting information and to rebut the Government's theories, there are certain kinds of information which must yield to a different balance. For example, if the statement of a witness provides an alibi, there is a need to develop it and that takes time. The same, of course, is true if the statement identifies a perpetrator of a charged offense who is different than the defendant who is charged with the offense. Nor is there warrant to further delay disclosure of equally important, facially exculpatory information.

This, the Court understands, places a heavy burden on the Government, but given its open disclosure policy thus far, the Gov-

ernment ought to encounter little difficulty in meeting that burden. If the Government genuinely is in doubt as to its obligations with respect to particular evidence, it may submit specific information to the Court *in camera* for review.

■ Based on the foregoing analysis, the United States is ordered to produce all *Jencks* material, whether *Brady* material or not, three days before commencement of jury selection, except for (1) evidence of alibi; (2) evidence that some person other than a defendant is the perpetrator of an offense with which a defendant is charged; and (3) other facially exculpatory evidence, which shall be produced in form redacted from the remainder of the statement of which it is part not later than April 18, 1997.

## IV. DEFENSE MOTIONS FOR PRE-SENTENCE REPORTS, STATEMENTS MADE DURING PROFFER SESSIONS, AND CERTAIN PLEA AGREEMENTS

### A. Presentence Reports

Defendants Beckford, Dennis, Cazaco, and Thomas seek production of the presentence reports ("PSRs") of all Government witnesses who have been sentenced in federal courts, including, but not limited to, those who have pleaded guilty to offenses alleged in the Superseding Indictment. The defendants argue that the PSRs constitute *Brady* material because they may contain exculpatory or impeachment evidence. Beckford, Dennis, and Cazaco also make more specific requests for state presentence reports concerning specified un-indicted co-conspirators who are expected to testify for the Government.

### 1. Are PSRs Jencks Act "statements"?

As a threshold matter, it is necessary to consider whether a PSR constitutes a "statement" within the meaning of the *Jencks* Act. If so, then any production of PSRs will be governed by the Government's agreement to

---

**6.** In this case, the majority of evidence requested by the defendants which constitutes both *Jencks* and *Brady* material consists of pure impeachment evidence. *See, e.g. supra* at Section IV(A)(3) (discussion of Tracy Lavache presen-

tence report). And, as discussed *infra* in Section II, this type of statement requires very little pretrial investigation in order to be useful to the defense at trial.

produce *Jencks* material three days before jury selection or by the provisions of Section III if those statements are covered therein.

The Fourth Circuit strictly and narrowly has defined what constitutes a "statement" under the *Jencks* Act. *See, e.g. United States v. Roseboro*, 87 F.3d 642, 645 (4th Cir.1996) ("a government agent's interview notes that 'merely select [ ] portions, albeit accurately, from a lengthy oral recital' do not satisfy the *Jencks* Act's requirement of a 'substantially verbatim recital.'") (*quoting Palermo v. United States*, 360 U.S. 343, 352, 79 S.Ct. 1217, 1224, 3 L.Ed.2d 1287 (1959)), *cert. denied,* —— U.S. ——, 117 S.Ct. 694, 136 L.Ed.2d 617 (1976); *United States v. Hinton,* 719 F.2d 711, 715 (4th Cir.1983) (government agent's notation of a witness' statements do not constitute a *Jencks* Act statement "unless it reflects the witness' own words fully and without distortion," and is coupled with "a finding of unambiguous and specific approval of specific notes"), *cert. denied,* 465 U.S. 1032, 104 S.Ct. 1300, 79 L.Ed.2d 699 (1984). This strict view has been reinforced in recent unpublished decisions.[7] Hence, there is no warrant for the Court to approach the matter differently.

Nearly all federal courts which have addressed the issue have held that a PSR is not a "statement" of the subject of the PSR for *Jencks* Act purposes. *See, e.g. United States v. Jackson,* 978 F.2d 903, 908–09 (5th Cir.), *cert. denied,* 508 U.S. 945, 113 S.Ct. 2429, 124 L.Ed.2d 649 (1993); *United States v. Wallace,* 32 F.3d 921, 930 (5th Cir.1994); *United States v. Moore,* 949 F.2d 68, 71 (2nd Cir. 1991), *cert. denied sub nom., Salami v. Unit-*

ed States, 503 U.S. 988, 112 S.Ct. 1678, 118 L.Ed.2d 396 (1992); *United States v. Dingle,* 546 F.2d 1378, 1380 (10th Cir.1976); *United States v. Dansker,* 537 F.2d 40 (3rd Cir.1976); *United States v. Gallo,* 653 F.Supp. 320, 328–29 (E.D.N.Y.1986); *United States v. Cuthbertson,* 511 F.Supp. 375, 382–83 (D.N.J. 1981), *rev'd on other grounds,* 651 F.2d 189 (3rd Cir.), *cert. denied,* 454 U.S. 1056, 102 S.Ct. 604, 70 L.Ed.2d 594 (1981); *United States v. Storey,* 956 F.Supp. 934, 934 (D.Kansas 1997); *but see United States v. Sasser,* 971 F.2d 470, 480 (10th Cir.1992) (suggesting that *in camera* review of PSR may be appropriate in some circumstances pursuant to the *Jencks* Act), *cert. denied,* 507 U.S. 924, 113 S.Ct. 1292, 122 L.Ed.2d 683 (1993).[8] The reasoning set forth in *United States v. Jackson* is illustrative of this view and is persuasive:

[A] defendant must either object to the report or adopt it. Adopting the report . . ., however, is very different from adopting a statement under the *Jencks* Act. The purpose . . . is to prevent a defendant from objecting to the report after sentencing. Adopting a report . . . amounts to little more than failing to object to the report.

To adopt a statement under the *Jencks* Act, on the other hand, a witness must read the entire statement and formally approve the statement. Otherwise, the witness could be impeached with a statement to which he did not agree. [The subjects of the PSRs] did not formally approve the statements in their presentence reports; they only interposed no objection to the reports. Thus, they did not

---

**7.** *See also, e.g. United States v. Kelly,* 107 F.3d 868, 1997 WL 79942 at *2 (4th Cir.1997) (unpublished) (Government agent's notes of a witness' statement, "even if the notes did constitute a 'substantially verbatim recital,' [ ] did not become the witness' statement [under *Jencks*] unless the witness read them or the agent read them to him. This requirement is not satisfied where, as here, the agent only read back occasional excerpts for clarification."); *United States v. Marva Maid Dairy,* 974 F.2d 1333, 1992 WL 224928 at *10–12 ("to qualify as a *Jencks* Act statement, [witness] must have signed, read, or heard the entire statement read").

**8.** The Tenth Circuit in *Sasser* inexplicably stated: "Most other circuits that have directly addressed

whether a defendant is entitled to a witness' presentence report under the *Jencks* Act have permitted review if it was in the hands of a prosecutor as distinguished from the probation officer, or have ordered production of parts of the report that contain impeaching material after *in camera* review by the court." 971 F.2d at 480. The court then cited seven decisions in support of that proposition.

Upon careful reading, however, the decisions cited in *Sasser* do not actually stand for the proposition that PSRs are discoverable under the *Jencks* Act. In fact, those cases held that PSRs may be discoverable *under Brady,* not *Jencks,* an important distinction that the *Sasser* Court apparently overlooked.

adopt their reports within the meaning of the *Jencks* Act.

978 F.2d at 908.

■■■■■■ For the same reasons, the Court adopts the majority rule and holds here that a PSR, *as a whole,* is not a "statement" within the meaning of the *Jencks* Act. However, certain parts of a PSR may very well constitute a *Jencks* Act "statement." For instance, a verbatim quotation from the Government-witness/PSR-subject in a PSR could constitute a *Jencks* "statement" if actually adopted by the subject of the PSR.[9] Moreover, if a letter or other signed document authored by the subject is appended to the PSR, that would constitute a *Jencks* "statement." Therefore, if a PSR in the Government's possession contains that kind of information, the Government must disclose it not later than three business days before jury selection or, if applicable, within the time frame set in Section III.

The fact that a PSR usually is not a *Jencks* Act statement does not end the matter, however. A number of courts, having held that PSRs are not *Jencks* "statements," have then considered whether a PSR nonetheless is discoverable as exculpatory or impeachment material under *Brady. See, e.g. United States v. Jackson,* 978 F.2d at 908–09 ("The defendants' inability to obtain the reports under the *Jencks* Act, however, does not end the matter. The Supreme Court has held that the due process clause requires the prosecution to disclose all evidence favorable to the accused.") (*citing Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215); *United States v. Moore,* 949 F.2d at 71 (same); *United States v. Dingle,* 546 F.2d 1378, 1380 (10th Cir.1976) (same); *United States v. Gallo,* 653 F.Supp. 320, 328–29 (E.D.N.Y.1986) (same). It is to this inquiry that the Court now turns.

**2. General Requests For Production of PSRs Under Brady**

■■■■■■ The defendants seek production of the pre-sentence reports for all Government witnesses, alleging generally that those reports contain *Brady* material. The Fourth Circuit recently dealt with this issue in *United States v. Trevino,* 89 F.3d 187 (4th Cir. 1996). In *Trevino,* the Court of Appeals recognized that PSRs are unique documents to which special *Brady/Ritchie* concerns attach. "[U]nlike most potential *Brady* material, the existence of a PSR is a foregone conclusion, and its general contents are predictable." *Id.* at 192. The Court of Appeals then explained:

> The result is that, although our adversary system of justice rightly requires defense counsel to uncover potentially favorable evidence, an experienced advocate may avail himself of a "free shot" by couching what is actually a general request for a witness' PSR in seemingly specific terms that might suffice as "some plausible showing" of materiality and favorability under *Ritchie* .... An accused armed with [ ] knowledge [of typical contents of PSRs] would almost certainly be able to satisfy *Ritchie*'s threshold requirement with regard to any cooperating witness by merely asserting that the witness' PSR contains evidence of his or her potential bias in favor of the government.

*Id.* In order to prevent such "free shots," the Court of Appeals held that generalized requests for the information in PSRs, such as the requests made by the defendants here, do not entitle the defendant to "engage in groundless fishing expeditions." *Id.* Having done so, the Court of Appeals specified what must be done by a defendant in order to prompt *in camera* review of the presentence reports of anticipated Government witnesses.

> [A] district court is under no duty to conduct an *in camera* examination of a requested PSR unless the accused has first clearly specified the information contained in the report that he expects will reveal exculpatory or impeachment evidence. Though the imposition of such a requirement will not eliminate "fishing expeditions" altogether, it may serve to curtail them.

---

9. *See United States v. Kelly,* 107 F.3d 868, 1997 WL 79942 at **2 (4th Cir.1997) (unpublished), (Government agent's notes of "substantially ver- batim recital" may be *Jencks* statement if the witness read them or the agent read them to him).

Further, in light of the important policy concerns attendant to the preparation and use of PSRs, we are not confident that the *Ritchie* threshold standard of evaluating the accused's proffer of materiality and favorableness adequately protects the compelling public and private interests in keeping confidential the data assembled therein; more than "some plausible showing" is needed. We therefore hold that, as a prerequisite to an *in camera* review, an accused must plainly articulate how the information contained in the PSR will be both material and favorable to his defense.

*Id.* at 192–93.

In assessing the defendants' generalized requests for the PSRs of all Government witnesses, it is necessary to: (1) briefly reflect upon the policy considerations underlying the requirement of a particularized showing as a preface to *in camera* review or production of PSRs under *Brady*; (2) assess whether the defendants' requests for the PSRs of all Government witnesses are sufficiently particular to warrant *in camera* review under *Trevino*; and (3) address the Government's *Brady* obligations attendant even where a defendant's request has not satisfied the requirements of *Trevino*.

Both the Supreme Court and the Fourth Circuit have emphasized two "valid· reasons to prohibit the routine disclosure of [PSR] contents to defendants in subsequent proceedings against whom the subject of the report will testify." *Trevino*, 89 F.3d at 191. In *U.S. Dep't of Justice v. Julian*, 486 U.S. 1, 108 S.Ct. 1606, 100 L.Ed.2d 1 (1988), the Supreme Court explained:

[I]n both civil and criminal cases the courts have been very reluctant to give third parties access to the presentence investigation report prepared for some other individual or individuals ... *[O]ne reason* for this is the fear that disclosure of the reports will have a chilling effect on the willingness of various individuals to contribute information that will be incorporated into the report. A *second reason* is the need to protect the confidentiality of the information contained in the report. Accordingly, the courts have typically required some showing of special need before they will

allow a third party to obtain a copy of a presentence report.

*Id.,* at 12, 108 S.Ct. at 1613–14 (emphasis added); *Trevino,* 89 F.3d at 191, 191 n. 4. *(citing Id.);* *see also United States v. Jackson,* 978 F.2d at 908 (same); *United States v. Moore,* 949 F.2d at 71 (same); *United States v. Dingle,* 546 F.2d at 1380 (same).

There is, however, a third policy rationale which has been invoked to justify strict limitations on the discovery of PSRs which is not discussed in *Julian* and which is only alluded to in *Trevino* itself. That is, the PSR is a *court document* created *for the courts* by the Probation Office, an *arm of the court. See* 18 U.S.C. § 3602(a) (district court appoints probation officers); 18 U.S.C. § 3603(9) (probation officer shall "perform any ... duty that the court may designate"); Fed. R.Crim.P. 32(b)(1) ("The probation officer must make a presentence investigation and submit a report to the court before the sentence is imposed."). Indeed, in *Trevino*, the Fourth Circuit emphasized that the PSR is a unique court document. *See United States v. Trevino,* 89 F.3d at 190 ("The PSR may serve many purposes, but its principal function is to assist the district court in imposing an appropriate sentence on the criminal defendant who is the subject of the report."); *see also United States v. Burton,* 631 F.2d 280, 282 (4th Cir.1980) ("The purpose of a probation report ... is to give to the sentencing judge the fullest possible information concerning the defendant's life and characteristics so that he may be able to impose an appropriate sentence.").

Several courts have based the denial of a defendant's *Brady* request for PSRs on the fact that PSRs are unique documents *of the courts. See, e.g. United States v. Sherlin,* 67 F.3d 1208, 1218 (6th Cir.1995) ("*Neither Brady nor the Federal Rules of Criminal Procedure mandate that a trial court produce a copy of a presentence report concerning a government witness, prepared for the court, to the defense upon request.* Nor do they require a trial court to review such a report *in camera* for potential *Brady* material.") (emphasis added), *cert. denied,* —— U.S. ——, 116 S.Ct. 795, 133 L.Ed.2d 744 (1996); *United States v. Trevino,* 556 F.2d 1265, 1270

(5th Cir.1977) (same)[10]; *United States v. Dingle*, 546 F.2d 1378, 1381 (10th Cir.1976) ("When the probation officer makes the investigation that forms the basis for a pre-sentence report, he is acting as an arm of the court and as an investigator for the Judge of the Court. *The pre-sentence report is not a public record, it is a confidential report for the use of the Judge of the Court in his effort to determine what a fair sentence should be.*") (emphasis added); *United States v. Hutcher*, 622 F.2d 1083 (2nd Cir.) (holding that the requirements of *Brady* apply only to the prosecution and not to the courts), *cert. denied*, 449 U.S. 875, 101 S.Ct. 218, 66 L.Ed.2d 96 (1980); *United States v. Greathouse*, 484 F.2d 805 (7th Cir.1973) (same); *United States v. Gallo*, 653 F.Supp. 320, 328 (E.D.N.Y.1986) ("Because they are court documents, presentence reports do not fall strictly within the ambit of the *Brady* rule requiring disclosure by the prosecution of evidence favorable to an accused.").

Those decisions take the view that PSRs possessed by the court "do not fall strictly within the ambit of the *Brady* rule." *United States v. Gallo*, 653 F.Supp. at 328. That is because *Brady* and its progeny involved evidence available to, and suppressed by, *the prosecution;* and, the decisions in those cases address only the proper role of the prosecutor in affording an accused a fair trial. *See Brady*, 373 U.S. at 87–88, 83 S.Ct. at 1196–97 ("A *prosecution* that withholds evidence on demand of an accused which, if made available, would tend to exculpate him or reduce the penalty helps shape a trial that bears heavily on the defendant. That casts the *prosecutor* in the role of an architect of a proceeding that does not comport with standards of justice ...") (emphasis added); *Kyles v. Whitley*, 514 U.S. at 432, 115 S.Ct. at 1565 ("The prosecution's affirmative duty to disclose evidence favorable to a defendant can trace its origins to early 20th century strictures against misrepresentation ...") (emphasis added). Therefore, in the view of

many courts, *Brady* is strictly inapplicable to the courts themselves. As the Fifth Circuit explained:

> Nothing in the *Brady* opinion would encompass a report compiled in an earlier prosecution and held by the convicting court in which the discovery motion is considered through its probation service. We decline to extend *Brady's* reach by holding that a discovery motion addressed in effect to a court or its probation officer, rather than the prosecution, asking production of a witness' presentence report, must be granted under *Brady's* authority.

*United States v. Trevino*, 556 F.2d 1265, 1269 (5th Cir.1977).[11]

Notwithstanding that *Brady* does not apply, by its terms, to the courts, at least three federal courts have held that a district court has an obligation similar to that imposed on the prosecution by *Brady* and its progeny. For example, in *United States v. Strifler*, 851 F.2d 1197 (9th Cir.1988), the Ninth Circuit held that: "A defendant is entitled to material in a probation file that bears on the credibility of a significant witness in the case.... The trial court should then review the file *in camera* and release to the defendant all information of this character." 851 F.2d 1197, 1201–02 (9th Cir.1988) (citations omitted), *cert. denied*, 489 U.S. 1032, 109 S.Ct. 1170, 103 L.Ed.2d 228 (1989). In *United States v. Gallo*, the district court took the view that: "It is not critical to the due process determination that the court rather than the prosecution holds the information. The prosecutor's role transcends the adversary. A fortiori that impartial role and responsibility rests on the court as well.... *It would be unconscionable for a court, relying on the technical inapplicability of Brady, to refuse disclosure of evidence it knows to be exculpatory.*" 653 F.Supp. at 328–30 (emphasis added). Similar reasoning was the basis for the decision in *United States v.*

10. It should be noted that the Fifth Circuit's 1977 *Trevino* decision bears no relation to the Fourth Circuit's 1996 case of the same style.

11. *See also United States v. Bourne*, 743 F.2d 1026, 1032 (4th Cir.1984) ("Presentence reports in the possession of the Court's Probation De-

partment are not 'in the possession of the United States' for *Jencks* Act purposes."); *United States v. Dansker*, 537 F.2d 40, 61 (3rd Cir.) (*Jencks* Act obligations apply only to prosecution and not to court), *cert. denied*, 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1976).

*Cuthbertson,* wherein it was observed that: "The Court, unlike the prosecution, is not an adversarial party in the proceedings. It sits neither to prove guilt nor establish innocence; but merely to maintain a fair trial. *It is almost inconceivable that a court, possessing exculpatory information, must remain silent when the prosecution possessing identical information would be compelled to speak.*" 511 F.Supp. at 382 (emphasis added).

For those reasons, several "courts have established a policy of conducting *in camera* review of requested presentence reports" in the possession of the probation department. *United States v. Gallo,* 653 F.Supp. at 329. It is not clear from those decisions whether this obligation is undertaken *sua sponte* or only upon defense requests for PSRs.

Although, in *Trevino,* the Fourth Circuit acknowledged that PSRs are unique court documents, it nonetheless declined to articulate the rather lenient review policy suggested in *Strifler, Gallo* and *Cuthbertson.* Instead, the Fourth Circuit struck a balance between fulfillment of the court's obligation of disclosure to the defendant and the court's interest in maintaining the privacy of its confidential court documents. Under that approach, *in camera* review of PSRs is not to be conducted unless the defendant first makes a particularized showing of "how the information contained in the PSR would be both material and favorable to his defense." *Trevino,* 89 F.3d at 192–93.

■ In this case, the defendants' requests for the PSRs of all Government witnesses fall far short of the standard set forth in *Trevino.* The defendants' generalized motions merely state that the PSRs may contain information "favorable" to the defense. There is no specific showing by the defendants in that regard; they instead merely rely on the predictable, general contents of presentence reports. This type of request does not suffice under *Trevino,* and therefore, *in camera* review of the requested PSRs is unwarranted.

■ It is important to note, however, that, although the Court has declined to engage in an *in camera* review pursuant to the

*Trevino* rule, the defendants are not entirely foreclosed from *Brady* discovery of exculpatory or impeachment information found in the requested PSRs. This is so because, even where "the accused does not specifically request that [privileged documents] be produced, this material is treated much like everything else in the government's file, *i.e.,* 'the prosecutor's decision on disclosure is final.'" *Trevino,* 89 F.3d at 189 (*quoting Pennsylvania v. Ritchie,* 480 U.S. at 59, 107 S.Ct. at 1002). Accordingly, courts have recognized that *where the prosecution possesses copies of PSRs,* its *Brady* obligations run to the disclosure of exculpatory and impeachment information contained in those reports. *See Pennsylvania v. Ritchie,* 480 U.S. 39, 107 S.Ct. 989, 94 L.Ed.2d 40, § 9 (1987); *United States v. Trevino,* 556 F.2d 1265, 1271 n. 7 (5th Cir.1977) ("[W]e do not attempt to contract *Brady* by insulating such presentence reports entirely from discovery if the prosecution does have in its possession . . . a witness' presentence report containing exculpatory material. In such instances *Brady* might well compel disclosure of relevant portions of the report."); *United States v. Sasser,* 971 F.2d at 480 (where prosecution possesses copy of PSR, *Brady* mandates disclosure of exculpating information contained therein); *United States v. Storey,* 956 F.Supp. 934, 934 (D.Kan.1997) (same).

In *Storey,* the district court "denie[d] defendant's request for the presentence reports themselves," but noted that "[t]he government acknowledges that certain information contained in the reports could be producible impeachment material under *Bagley,* and it agrees to disclose any such information." 956 F.Supp. 934, 934 Notwithstanding that here the Court has denied the defendants' requests for the PSRs themselves, the Court fully expects that the Government will comply with its obligations under *Brady* and its progeny with respect to PSRs which are in its possession. And, the Government must remain ever mindful of the recent statement by the Supreme Court in *Kyles v. Whitley:*

This means, naturally, that a prosecutor anxious about tacking too close to the wind will disclose a favorable piece of evidence. This is as it should be. Such disclosure

will serve to justify trust in the prosecutor as the representative of a sovereignty whose interest in a criminal prosecution is not that it shall win a case, but that justice shall be done. And it will tend to preserve the criminal trial, as distinct from the prosecutor's private deliberations, as the chosen forum for ascertaining the truth about criminal accusations.

514 U.S. at 439–40, 115 S.Ct. at 1569 (internal citations and quotations omitted). As the Supreme Court stated, "[t]his is as it should be." *Id.* The timing of any required disclosure depends on the nature of the *Brady* information and will be governed by the Court's November 8, 1996 Order and by Sections II and III of this Memorandum Opinion.

### 3. Tracy Lavache Presentence Report

Dean Beckford and Claude Dennis have made a specific *Brady* request for the state presentence report of Tracy Lavache, an unindicted co-conspirator in the Poison Clan and an expected Government witness. Further, the defendants allege that the Government is in violation of *Brady* and the discovery order in this case [12] for having failed to produce the Lavache PSR.

Lavache is an alleged victim of Poison Clan violence, having allegedly been assaulted and abducted by defendants Dean Beckford and Claude Dennis on October 9, 1989. Those allegations are set forth in Racketeering Act Four of Count 1 of the Superseding Indictment and in Overt Act 18 of Count 3 of the Superseding Indictment.[13]

Dennis was tried in the Circuit Court for the City of Richmond for the Lavache assault and abduction. On June 15, 1990, Lavache, who had himself been tried for murder in state court, and who was the subject of a presentence report prepared by a state probation officer, testified for the state at Dennis' trial. Lavache stated on direct examination that he was told to come to the back of an alley, and then was shot by Dennis behind a house at 1800 Rose Avenue. Dennis Trial Transcript, June 15, 1990 at pp. 18–27. Thereafter, counsel for Dennis called Lavache's probation officer to testify about a prior inconsistent statement made by Lavache to that officer. The probation officer was presented with Lavache's presentence report to refresh her recollection. After reviewing the report, the probation officer testified that Lavache had told her that he was shot in the kitchen of a rooming house on West Grace Street. *Id.* at 101.

 There is no question but that the Lavache PSR constitutes *Brady* material. Lavache's rendering of the account to a state agent, his probation officer, that the assault took place in a different location than alleged by Lavache under oath at trial constitutes valuable impeachment evidence against a crucial prosecution witness. And, the Government concedes, as it must, that this request is a perfect example of the type of particularized request required by *Trevino* in order for a defendant to gain entitlement to *in camera* review and production of a PSR. Accordingly, were the Lavache PSR in the possession of either the United States Attorneys Office or the Probation Department of this Court, the Court would conduct an *in camera* review of the report. However, the prosecution has proffered that it does not possess a copy of Lavache's state presentence report; and, Lavache's PSR remains in the custody of the state court for which it was drafted. Hence, because "clearly the government cannot be required to produce that which it does not control and never possessed or inspected," *United States v. Anderson*, 39 F.3d 331, 349 (D.C.Cir.1994), *cert. denied*, —— U.S. ——, 116 S.Ct. 542, 133 L.Ed.2d 445 (1995), Lavache's PSR is not

---

**12.** The Government has entered into a stipulated discovery order with each defendant in this case wherein it agrees to produce all *Brady* material forthwith.

**13.** Lavache was found near death in Williamsburg, Virginia on October 9, 1989. Lavache informed the authorities that Dean Beckford shot him twice in the chest, that Beckford and Dennis transported him (Lavache) in the trunk of a car, and left him for dead on the side of a highway. Incredibly, Lavache lived to tell his story; after "playing dead," Lavache managed to catch the attention of a passing driver by throwing his shoe at the moving vehicle. That driver notified the authorities who took Lavache to a hospital. Following extensive treatment, Lavache recovered from his near fatal wounds.

*Brady* material in the possession of the United States.[14] *See also United States v. Bourne,* 743 F.2d 1026, 1032 (4th Cir.1984) ("Presentence reports not 'in the possession of the United States' for *Jencks* Act purposes" are not discoverable). Consequently, there has been no *Brady* violation on the part of the Government for its failure to produce the Lavache report.[15]

### 4. Presentence Reports for Peter Paul, Collin Joseph, Christopher Harris, and Corry Woody

Defendant Cazaco seeks the production of presentence reports for four expected Government witnesses: Peter Paul and Collin Joseph, both of whom have been sentenced for federal offenses; and Christopher Harris and Corry Woody, both of whom have been sentenced in state court. Cazaco asserts that the reports may contain valuable impeachment evidence as to these key Government witnesses.

The prosecution does not possess the Harris or Woody reports, which remain in the custody of the state courts in which they were sentenced; therefore, the prosecution is not obligated to produce those reports under *Brady.* As for Paul's and Joseph's federal PSRs, Cazaco argues that his request is sufficiently particularized under *Trevino* to warrant *in camera* review of the PSRs. To pass muster under *Trevino,* however, a defendant must do more than merely provide a list of the specific witnesses whose PSRs are sought: he must specify the particular *information* within the report which is alleged to constitute *Brady* material. *See Trevino,* 89 F.3d at 192–93 ("[A]s a prerequisite to an *in camera* review, an accused must plainly ar-

ticulate how the *information* contained in the PSR will both be material and favorable to his defense.") (emphasis added); *Id.* at 192 (the accused must "clearly specif[y] the *information* contained in the report that he expects will reveal exculpatory or impeachment evidence."). In contrast to Dean Beckford's request for the Lavache report, which specified the alleged *Brady* material therein, Cazaco's motion does not satisfy the *Trevino* standard with respect to the Paul and Joseph reports. Nonetheless, the Government has agreed to produce the Paul and Joseph reports forthwith, so Cazaco's motion is effectively moot as to those reports.

### B. Witness Proffer Statements and Related Government Memoranda

Defendants Thomas and Beckford move the Court to order production of two types of evidence arising from proffer statements from Government informants to Government agents pursuant to Fed.R.Crim.P. 35 or U.S.S.G. § 5K1.1. These proffer statements are customarily made by an informant in an effort to receive "substantial assistance" leniency from the prosecution and the courts.

■ First, the defendants request copies of any Government memorandum or motions to a court requesting a downward departure from the Sentencing Guidelines on behalf of a witness who has provided "substantial assistance." As discussed above, this type of document falls squarely within the ambit of *Giglio,* and the Court has previously ordered the Government to produce such material three business days before the commencement of jury selection in this case. *See*

---

**14.** It is important to note, however, that although it is under no such obligation, the Government has offered to assist the defendants in obtaining Lavache's state-court PSR as well as the state reports for other Government witnesses.

**15.** Moreover, the Fourth Circuit consistently has emphasized that "the *Brady* rule does not apply if the evidence in question is available to the defendant from other sources." *United States v. Wilson,* 901 F.2d 378, 380 (4th Cir.1990); *see also United States v. Kelly,* 35 F.3d 929, 937 (4th Cir.1994); *United States v. Trevino,* 89 F.3d at 193 n. 6 ("In evaluating the probable materiality and favorability of the requested information, the

district court may consider, among other things, whether the material may be available from other sources ...."). In this case, although the Lavache report *itself* may not be available to the defendants, the impeachment information sought by the defendants is alternatively available (*e.g.* the defendants may call Lavache's state probation officer or may introduce the transcript from Dennis' state court trial). Indeed, the Government has already provided the defendants with a copy of the transcript from the Dennis trial. Further, the defendants may attempt to secure the PSR by compulsory process.

Memorandum Order, November 8, 1996 at 4–5.

The defendants also seek production of any proffer statements made by Government witnesses to Government agents. As a threshold matter, it is necessary to determine whether these proffers constitute "statements" under the *Jencks* Act. The Fourth Circuit consistently has held that a Government agent's notes of proffer sessions do not qualify as *Jencks* statements. *See, e.g. United States v. Roseboro,* 87 F.3d at 645 ("a government agent's interview notes that 'merely select [ ] portions, albeit accurately, from a lengthy oral recital' do not satisfy the *Jencks* Act's requirement of a 'substantially verbatim recital.' ") (*quoting Palermo v. United States,* 360 U.S. 343, 352, 79 S.Ct. 1217, 1224, 3 L.Ed.2d 1287 (1959)); *accord United States v. Cox,* 836 F.Supp. 1189, 1203 (D.Md.1993) (government agent notes of proffers sessions not producible under the *Jencks* Act where "notes do not contain verbatim or essentially verbatim statements of the witnesses. They contain the thoughts and other work product of the government attorneys.").[16]

■ Thus, the Government is not ordinarily required to produce its witness' proffer statements under the *Jencks* Act, because those statements are customarily memorialized only in Government agent's notes. However, if the Government possesses a signed, written proffer statement from the witness, or when the agent's notes contain a "substantially verbatim recital" of the witness' statement which the witness has read and affirmed, that proffer statement would constitute *Jencks* Act material.

■ Where a proffer statement is not producible under the *Jencks* Act, a defendant is entitled to its production only if the statement constitutes "favorable evidence to an accused" under *Brady* and its progeny (*e.g.,* exculpatory or impeachment evidence). (Of course, as discussed at length above, evidence such as a proffer statement may constitute both *Brady* and *Jencks* Act material.)

Based on the foregoing analysis, it shall be required that:

1. The prosecution shall produce all proffer statements which constitute *Jencks* material (whether *Brady* material or not) not later than three business days before the commencement of jury selection;

2. The prosecution shall produce all non-*Jencks* proffer statements which constitute *Giglio* impeachment material not later than three business days before the commencement of jury selection; and

3. The prosecution shall produce all exculpatory non-*Jencks* proffer statements in accordance with *Brady v. Maryland,* as explained in Section II of this Memorandum Opinion.

### C. Plea Agreements

■ Defendant Cazaco seeks the entry of an order requiring the immediate production of all plea agreements between the Government and Peter Paul, Collin Joseph, Christopher Harris, or Corry Woody. Plea agreements are clearly *Giglio* impeachment material. *See* Memorandum Order, November 8, 1996 at 4–5. Therefore, the Government need not produce these documents until three business days before the commencement of jury selection. Cazaco's motion for immediate production is therefore DENIED.

The Clerk is directed to send a copy of this Memorandum Opinion to all counsel of record.

It is so ORDERED.

---

16. The same principle has been recently invoked in *United States v. Kelly,* 107 F.3d 868 (4th Cir. 1997) (unpublished), wherein the Court of Appeals held that a Government agent's notes of a witness' statement, "even if the notes did constitute a 'substantially verbatim recital,' [ ] did not become the witness' statement [under *Jencks* ] unless the witness read them or the agent read them to him. This requirement is not satisfied where, as here, the agent only read back occasional excerpts for clarification." *Id.* 107 F.3d at 868, 1997 WL 79942 at *2; *see also United States v. Dorsey,* 27 F.3d 564, 1994 WL 320220 at *1 (4th Cir.1994) ("A witness's 'statement' ... does not include notes or summaries of an interview which are not adopted by the witness. The reports of the proffer sessions were not signed or adopted by [the witnesses] and were not discoverable as their statements under the *Jencks* Act.").